MARGARET DUFFY *vs.* YELLOW CAB COMPANY OF PROVIDENCE.
BEVERLY E. DUFFY, *p.a. vs.* SAME.

JULY 20, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

FLYNN, C. J. These actions of trespass on the case for negligence were brought respectively by Margaret Duffy individually and by her as next friend of Beverly E. Duffy, her minor daughter, to recover damages resulting from injuries to the daughter caused by the alleged negligent operation of defendant's taxicab. The cases were tried together

in the superior court where a jury returned verdicts of $1,500 for the mother and $11,000 for the daughter. Thereafter the trial justice granted defendant's motion for a new trial in each case unless a remittitur was filed of all of the verdict in excess of $1,300 in the mother's case and all over $7,500 in the daughter's case. Each plaintiff duly filed a remittitur as ordered, and the cases are before this court on defendant's bills of exceptions to the denial of its motions for new trials and to certain instructions to the jury.

Since both cases depend on proof of defendant's liability to the plaintiff daughter and raise the same legal questions, we shall herein refer to the daughter as the plaintiff but our decision will apply to both cases. The following facts are either undisputed or established by the evidence for the plaintiff.

On October 11, 1948, about 11:20 p.m., plaintiff while crossing Dorrance street, a public highway in the city of Providence, was struck and injured by a taxicab which was owned by defendant and was operated by its agent and servant. In that location Dorrance street, generally speaking, runs north and south and is about 80 to 90 feet wide between the curb in front of the city hall, which is on the west side, and the area marked off as a safety zone for pedestrians waiting to board electric cars and busses, which is on the east side of that street. At the time a crosswalk marked by solid whitened cement about 8 to 10 feet wide extended from the curb in front of the city hall steps directly across Dorrance street toward the shelter in the safety zone.

It was raining hard and all street and car lights were fully lighted. Plaintiff, a minor of seventeen years, and her girl companion had come from a theater, had crossed to the city hall side of Washington street from the Biltmore Hotel, which is at the northwesterly portion of the area, and intended to cross Dorrance street to the safety zone in order to board a Pawtucket bus. Just before the girls started from a place close to the curb in front of the city hall no

traffic was moving in the immediate area. They looked first to their left and saw the lights of several automobiles that were stopped at the traffic light on the depot side of the Biltmore Hotel, which was about 200 feet to the plaintiff's left. As they were crossing the girls were holding hands, the plaintiff being on the right and about half a step ahead of her companion. They were hurrying but not running.

The precise direction in which they crossed Dorrance street is a matter of conflicting inferences. The plaintiff, corroborated by two disinterested witnesses, testified she had walked from Washington street in the gutter of Dorrance street to the crosswalk and then proceeded to cross on the white crosswalk. Her companion, however, indicated they had walked about ten feet from the southerly side of Washington street and then crossed diagonally toward the shelter in the safety zone. At any rate, when they were half way across Dorrance street plaintiff again looked and saw the traffic at the Biltmore Hotel just starting, apparently on a change of the traffic light, and she continued to walk toward the safety zone dividing her "attention between crossing and watching the traffic."

One of those cars seemed to get out in front of the others and when she was about three fourths of the way across Dorrance street, or within about 15 feet of the bus safety zone, she noticed the lights of that car about 25 feet away to her left. She had expected it would go behind her, but when she realized it was bearing directly toward her without change of speed or direction she was "petrified" and stopped. The right front fender and headlight of that car, which proved to be a Yellow taxicab owned by defendant, struck her and she was thrown, rolled or pushed by the taxicab for some 25 feet. When the cab was brought to a stop its rear was just inside the southerly side of the white crosswalk and the front was some 7 or more feet beyond that side to the south.

The plaintiff's companion, who testified as a witness for defendant, estimated that when she noticed the cab's lights

coming directly toward them it was 40 to 45 feet away. She was slightly behind plaintiff and on her left, that is, nearest to the cab, and was holding hands with plaintiff practically up to the time the latter was hit. She stopped and though she indicated that plaintiff may have gone forward yet because it happened so quickly she was not certain of all the details. While plaintiff's companion also testified that she was not struck, touched or knocked down by the cab, two witnesses testified they saw her go down at the time plaintiff was hit. She admitted her stocking was damaged at the knee as they testified, but was unable to explain how it happened or why defendant had paid $20 to her or her parents for a general release of her claims.

There is some conflict as to just where the girls were when the accident occurred. According to plaintiff and certain of the witnesses she was on the crosswalk a few feet southerly from the left or depot side. Her companion was not certain of the exact location or her estimate of distances. But the cab's operator testified that he pointed out to the defendant's "starter," who had come from his station at the Biltmore Hotel a few minutes after the accident, the presence of glass in the highway beginning about five feet from the white crosswalk on the depot side and spreading out over the crosswalk in the general direction taken by the cab. The operator's mother-in-law, who was riding in the rear seat of the cab, testified that with her hand she had cleared a small portion of the condensation on the right side window and through that small spot had seen the girls running diagonally across Dorrance street. From this evidence and the other testimony, especially of plaintiff's companion that they had crossed diagonally, defendant claims the plaintiff was not on the crosswalk when the accident happened.

In any event the operator of the cab admitted that he never saw the girls at any time while they were crossing Dorrance street. The first he knew of plaintiff's presence was when he heard a thud against his right front fender

and headlight, when he was proceeding at 15 or 20 miles per hour in "second speed." He then applied the brakes promptly and brought his cab to a stop within a distance of some 20 to 25 feet. He testified that the windshield wipers of the cab were working and to that extent gave him a clear view to the front of the cab; that the other windows were covered with rain and condensation obscuring his view toward the side; and that at least two other cars were on his right as they all came into the area from the traffic light at the Biltmore Hotel, where his cab had been stopped.

But another automobilist who had come into the area from Washington street intending to make a wide loop around Exchange Place toward the south side had no difficulty in seeing the girls crossing Dorrance street. Apparently he also saw defendant's cab more or less parallel with his car and traveling at least 40 to 45 feet to his left or nearer the safety zone with no cars between them. In other words, there was at least 40 feet of Dorrance street in back of plaintiff which was free of traffic and could have been used by defendant's operator if he had seen the girls and had turned the cab slightly to his right.

As a result of the accident plaintiff was hospitalized twenty-three days. She sustained fractures of the upper and lower skull, bruises, contusions and cuts on the legs, and a slight but permanent injury to her hearing in one ear. She was confined to her home for two additional months and was unable to work after school as formerly when she had averaged $19.22 per week in wages. Her total wages during the year 1948 was $798.51.

She made an excellent recovery, according to her doctor, and returned to school early in 1949 and was graduated with her class in June of that year. But she still complained of headaches and other nervousness at times, and also of not being able to hear as well through her right ear as she could before the accident. The total hospital and medical

bills and loss of wages of plaintiff amounted to approximately $1,300.

The trial justice on defendant's motions for new trials discussed the evidence, pointed out the frank testimony of defendant's operator to the effect that he did not see plaintiff until after his cab struck her, and came to the conclusion that on the issue of liability the conflicting evidence was such that fair-minded persons might honestly come to different reasonable conclusions. From an independent examination he was unable to say that the verdict was contrary to the preponderance of evidence on the issues of defendant's negligence and the plaintiff's freedom from contributory negligence.

On the question of damages, however, he pointed out that the charge of the court limited the recovery in the mother's case to $1,300, the substantial amount of bills she had paid plus loss of plaintiff's wages. In the case of the minor daughter he conceded the seriousness of the injuries but called attention to her excellent recovery, discussed the important testimony of the doctors, and commented on the attitude of plaintiff "to augment and exaggerate the serious injuries and damages beyond all proportions." He discounted the damage to her hearing, which was not evidenced in a practical sense during the trial, and finally concluded that the damages were grossly excessive, and ordered a remittitur of all of the verdict in excess of $7,500.

Defendant first presses exception numbered 5 which, according to the bill of exceptions and brief, is to that portion of the charge wherein the trial justice is said to have instructed the jury, in substance, that plaintiff was entitled to be compensated "as far as possible" for the head and other injuries if caused by the accident. Defendant contends that the use of the words "as far as possible" encouraged the jury to award greater damages than plaintiff was entitled to recover according to law; that if defendant were found liable the compensation for plain-

tiff's injuries was not to be measured by speculative and remote considerations which might well come within the words "as far as possible"; and that such erroneous instruction was not corrected or qualified elsewhere by the court but was further emphasized by a later explanation as follows: "It is just to make Beverly whole as far as dollars and cents can make Beverly whole in the situation."

According to defendant this instruction was evidently followed by the jury to such an extent that even the trial justice later pronounced the damages excessive because, as he stated in his rescript, the jury "were improperly influenced by sympathy and pity for her, a young girl still in her teens, who made a most appealing witness, causing the jury to be swayed by passion, prejudice and partiality * * *." Finally defendant contends that it was entitled to a proper charge on the law, and that a jury, if properly instructed in the beginning, might well have given less damages than the trial justice later approved, and that a remittitur in the case would not correct the erroneous charge.

The defendant in this argument assumes that the trial justice's instructions as to damages would mislead the jury to award the plaintiff damages "as far as possible," apparently as if he meant "as much as possible." In our opinion the charge of the court as to compensation for injuries, pain and suffering does not warrant the extreme emphasis placed by defendant upon the words "as far as possible." Here the words complained of were used by the trial justice only in connection with an enumeration of the injuries and testimony which the jury were entitled to consider, if they found a causal relation between those injuries and the accident. It is clear from the context that he qualified those words and also expressly warned the jury that the province of compensatory damages was not to punish or penalize the defendant. In like circumstances some expression to the effect that an injured plaintiff, if essential elements are proved, is entitled to be made whole as far

as that can be accomplished reasonably by a money award is not unusual in treating compensatory damages. From our examination of the whole context we cannot say that this portion of the charge was calculated to encourage or permit the jury to speculate or indulge in remote considerations regardless of the evidence and the law as otherwise given to them. This exception is overruled.

Defendant's exception numbered 6 relates to the denial of its motion in each case for a new trial unconditionally. It argues that, assuming the negligent operation of defendant's cab, plaintiff could not fairly be found to have fulfilled the requirements of the charge to the effect that it was her duty "to be in the exercise of due care or ordinary care" and that "ordinary care is such care as a person of ordinary prudence exercises under the circumstances of the danger to be apprehended." It contends that no rationalization of the standard of care in the circumstances is necessary here because plaintiff's companion in the same circumstances had avoided the defendant's cab by stopping, thus establishing due care, whereas plaintiff went forward or must have done something which was the proximate cause of the accident. Defendant further argues that, measured by the companion's conduct, the verdict on the issue of plaintiff's freedom from contributory negligence is against the preponderance of the evidence.

We have examined the transcript and we do not find that the trial justice misconceived the law or overlooked any material evidence in this respect. There is a conflict as to how plaintiff crossed Dorrance street and also whether she was on the crosswalk when she was struck by the cab, as she and two corroborating witnesses testified, or whether she was about 5 feet on the depot side thereof, as indicated by the broken headlight glass in the street and possible inferences from the testimony of plaintiff's companion and others. However, whether she was on the crosswalk or slightly to the north thereof would make no material difference in the circumstances because the driver frankly

admitted he never saw either the crosswalk or the girls at any time while the latter were crossing Dorrance street toward the safety zone, and that he did nothing to stop, check the speed, or change the course of the cab. In these circumstances mere presence on the street outside the crosswalk would not make her guilty of contributory negligence as a matter of law.

According to the great weight of evidence there was ample room for defendant's operator to have driven in back of the girls if he had seen them, which was the course expected by plaintiff. There was no evidence that her companion did anything but stop when she noticed the cab bearing down upon them. That is just what plaintiff did according to her testimony which was corroborated substantially by others. Apparently the jury could find that the only difference was that the companion happened to be half a step behind plaintiff, thus avoiding contact with the cab and serious injury.

In the circumstances we are of the opinion that it was for the jury to decide whether plaintiff stopped or went forward, and whether she acted reasonably in assuming that the operator would see her and control his cab accordingly, and whether it was reasonable and prudent judgment, when the circumstances had changed, for her to stop, if she did, thus giving the driver an opportunity to go either in front or in back of her where there was ample room. The evidence, as the trial justice stated, is open to different inferences on these questions, and we cannot say that his decision was clearly wrong in holding that the verdict of the jury was not against the preponderance of the evidence. This exception is overruled.

As the defendant has expressly waived any claim that the damages as reduced by the remittiturs are still excessive, we need not consider that issue. All other exceptions not briefed or argued are deemed to be waived.

All of the defendant's exceptions in each case are overruled, and each case is remitted to the superior court for

entry of judgment on the verdict as reduced by the remittitur.

*Crowe & Hetherington,* for plaintiffs.

*Raymond F. Henderson,* for defendant.