**Donna REILLY, etc., et al.,
Plaintiffs, Appellees,**

v.

**UNITED STATES of America,
Defendant, Appellant.**

**No. 88–1442.**

United States Court of Appeals,
First Circuit.

Heard Sept. 16, 1988.

Decided Dec. 14, 1988.

**152**

Howard S. Scher, Appellate Staff, Civil Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Washington, D.C., Lincoln C. Almond, U.S. Atty., Providence, R.I., and Robert S. Greenspan, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., were on brief for defendant, appellant.

Mark S. Mandell with whom Susan M. Carlin and Mandell, Goodman, Famiglietti & Schwartz, Ltd., Providence, R.I., were on brief for plaintiff, appellees.

Before BOWNES and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

* Of the District of Massachusetts, sitting by desig-

SELYA, Circuit Judge.

Peter Reilly and Donna Reilly, husband and wife, and their minor daughter, Heather, appellees before us, brought this medical malpractice action against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.* Following a bench trial, the United States District Court for the District of Rhode Island awarded plaintiffs $11,037,-964 in damages and entered a judgment in that amount. *Reilly v. United States,* 665 F.Supp. 976 (D.R.I.1987) (*Reilly I*). The defendant moved to set aside the judgment; the district court denied the motion. *Reilly v. United States,* 682 F.Supp. 150 (D.R.I. 1988) (*Reilly II*). The United States appeals.

Appellant recites an alphabet of error: it claims, among other things, that the court below erred in—

*A*ppointing a technical advisor;

*B*rushing aside a state collateral source statute;

*C*alculating lost earning capacity;

*D*eclining to order staggered payments in lieu of a lumpsum award (or in the alternative, refusing to consider the cost of a periodic-payment annuity in determining damages);

*E*xceeding the amount of plaintiffs' administrative claim without just cause; and

*F*ashioning an award which allowed duplicative recovery.

Given the range and reach of appellant's contentions, this futhark should be read as more limning than limitary. Yet the appeal is a mixed bag. The government has raised some close questions which deserve careful attention and analysis; we address those in the alphabetical order listed above, except that we merge the third and sixth assignments of error. On the other hand, appellant has also attempted to capitalize on avowals which are patently meritless, or procedurally defaulted, or both; those need not be mentioned specifically, but are rejected out of hand. When everything is said and done, we find that the judgment is

nation.

consonant with the letter of the law in all particulars save one.

## I. BACKGROUND

Liability is conceded, as is the nature and extent of Heather Reilly's injuries. *See Reilly I,* 665 F.Supp. at 980. Nevertheless, we deem it useful to summarize succinctly the underlying facts (borrowing heavily from the district court's opinions) and delineate the travel of the case.

A. *What Transpired.* On December 11, 1984, Peter Reilly was on active duty with the Navy. On that date, a gravid Donna Reilly was admitted to Newport Naval Hospital. After some six hours in labor, the electronic monitor indicated a dramatic deceleration in fetal heart rate. The district court found, supportably, that this development should have signalled the obstetrician to perform a caesarean section immediately because the baby was in danger of asphyxiation. *Id.* at 979. The physician instead removed the monitor and insisted on undertaking a vaginal delivery, thereby delaying the birth. When the delivery was eventually performed, it required the application of a vacuum/suction instrument to the baby's head. The departure from prudent professional standards was palpable.

As a result of the doctor's manifest negligence, Heather Reilly was born with severe, apparently irremediable, brain damage. The district court determined, sadly but accurately, that she was left "a helpless individual, 'significantly delayed developmentally' and unable to see; she will never be able to walk, talk, feed or take care of herself in any way." *Id.*

B. *Travel of the Case.* Heather's parents filed an administrative claim with the Navy on May 7, 1985 in the amount of $10,000,000. When the matter was not definitively resolved within six months next following, suit was brought under the FTCA.[1] The administrative claim was never amended.

Plaintiffs' complaint sought damages for Heather's grievous injuries and losses consequent thereto (including future-care expenses and deprivation of earning capacity). Mr. & Mrs. Reilly also sued for emotional distress and loss of love, society, and affection. *See Reilly I,* 665 F.Supp. at 983. After discovery was completed, a 7–day bench trial ensued. Both sides introduced expert testimony as to the calculation of damages for lost earning capacity. Appellees also supplied expert testimony regarding expenses for Heather's future care, but "the government presented almost no factual argument against the necessity for and pecuniary valuation of the[se] itemized damages." *Id.* at 1000. The trial came to a halt on November 26, 1986—but, as matters turned out, more evidence was to be taken at supplementary hearings.

During the interval between the trial and the resumed hearings, the district judge attempted to enlist an economist to assist him in respect to certain technical aspects pertinent to the calculation of a damage award. *Reilly II,* 682 F.Supp. at 152. He approached several potential candidates. *Id.* at 152–53. Professor Feldman, an economist at Brown University, disqualified himself because he had previously discussed the case with the plaintiffs' lawyer; others were contacted and one agreed to serve. *Id.* The judge did not inform counsel of his search. By happenstance, the government learned of it when an assistant United States Attorney (AUSA), in an apparent effort to prepare for the supplementary hearings, called Professor Feldman. The academician forthrightly informed the AUSA that he had already worked on the case at the behest of plaintiffs' lawyer, and mentioned in passing that he had also been contacted by the judge.

The AUSA immediately requested a chambers conference. The session was held on April 10, 1987. The district judge recounted his conversations with the economists and made no bones about his intent

---

**1.** 28 U.S.C. § 2675(a) provides in substance that an FTCA action shall not lie unless a claim has first been presented to the appropriate federal agency and denied. If the agency fails to make

a final disposition of the claim within six months, however, the claimants are permitted to proceed as though the claim had been rejected. *See id.*

to hire one as a technical advisor. He informed all counsel that he had already contacted the Administrative Office of the United States Courts (AO) to this end, and that he was awaiting approval from the Chief Judge of the First Circuit.[2] The government voiced no contemporaneous objection to the procedure, did not ask the name of the economist whom the court intended to retain, did not ask that either the court's instructions to the expert or the expert's advice be reduced to writing, and did not request an opportunity to question him.

To make a tedious tale tolerably terse, the approvals were forthcoming, *see Reilly II*, 682 F.Supp. at 154–55 & n. 1, and the judge appointed Dr. Arthur Mead of the University of Rhode Island to act as a technical assistant to the court. The judge had two short conferences with Dr. Mead in the spring of 1987. During the same time frame, the court conducted supplemental evidentiary hearings on April 16 and May 5, 1987. On July 28, an opinion and order was issued awarding Heather Reilly $1,000,000 for pain and suffering, $1,104,641 for lost earning capacity, and $8,933,323 in respect to anticipated future care. *Reilly I*, 665 F.Supp. at 1008. The

judge reserved the claims concerning the Reillys' emotional distress and loss of spousal and parental consortium, and certified the underlying state-law questions to the Rhode Island Supreme Court.[3]

The government moved for a new trial, amending its motion in December 1987 to add Dr. Mead's service as a further basis for relief. The motion was denied by the district court in an erudite opinion concerned exclusively with the court's engagement of a technical advisor. *Reilly II*, 682 F.Supp. 150. The court regarded all of the other grounds asserted in the motion as a rehash of arguments previously made and rebuffed. *Id.* at 151.

It is against this backdrop that we proceed to ponder the orthography of appellant's alphabet of error.

## II. APPOINTING A TECHNICAL ADVISOR

The United States concedes that a district court has inherent authority to appoint an expert as a technical advisor.[4] *See, e.g.,* Appellant's Brief at 22–23 n. 17; Reply Brief at 1. It maintains, notwithstanding, that (1) such power is strictly circumscribed

---

2. The district court secured AO permission, believing such authorization to be essential to appointing a technical advisor. *See Reilly II*, 682 F.Supp. at 153–55. "In an abundance of caution and concern," *id.* at 155 n. 1, the court also obtained advance approvals from the Chief Judge of the First Circuit and the Circuit Council. There is no necessity for us to elaborate on mechanics of this sort, inasmuch as the United States does not argue that some other or further administrative sanction was required. Accordingly, we take no view as to which—if any—of these approvals may be prerequisites to the hiring of an advisor.

3. The state supreme court has since answered the certified questions, explaining that, as a matter of state law, "a plaintiff must suffer physical symptomatology" to recover such damages. *Reilly v. United States*, 547 A.2d 894, 896 (R.I. 1988) (*Reilly III*). That pronouncement, as we understand it, effectively defeats the Reillys' claims for infliction of emotional distress and loss of spousal consortium. While the parents may still have a claim in theory under R.I. Gen. Laws § 9–1–41(c) for deprivation of their daughter's society and companionship, *see Reilly I*, 665 F.Supp. at 987—a matter on which we pass no judgment—neither we nor the district court have any occasion to consider that possi-

bility. The question is wholly academic in view of the monetary ceiling applicable to the aggregate claims. *See* text *infra* Part VI.

4. The court below held that it had both statutory and inherent authority to appoint a technical advisor. *See Reilly II*, 682 F.Supp. at 153–55 (discussing statutory scheme); *id.* at 155–62 (discussing general authority). Because we agree that such power inheres generally in a district court, *see, e.g., Ex parte Peterson*, 253 U.S. 300, 312–13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920), we need not explore—and express no opinion on—the lower court's view of the statutory mosaic. By the same token, we need not analyze the suggestion (eschewed by all of the parties to this case) that Fed.R.Civ.P. 53, which deals with the naming of masters, may be a fertile source of judicial power to retain necessary technical assistance. *See, e.g., Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir.1979) (authority to appoint "expert advisors or consultants" derives from either Rule 53 or court's inherent power); *Hart v. Community School Bd.*, 383 F.Supp. 699, 764 (E.D.N.Y.1974) (Rule 53 "is broad enough to allow appointment of expert advisors").

by Fed.R.Evid. 706(a),[5] a rule whose protocol the district court saw no need to obey; (2) the court abused its discretion in appointing an advisor at all in this case; (3) the court's appointee far exceeded the limited role of a technical advisor; and (4) the absence of meaningful procedural safeguards rendered utilization of the advisor fundamentally unfair. We examine these points *seriatim*.

### A. *Rule 706.*

█ Throughout its text, Fed.R.Evid. 706 refers not to "experts" generally, but to a more exclusive class: "expert witnesses." Because the plain language of a Civil Rule is the most reliable indicator of its meaning, we are constrained to conclude that the grasp of Rule 706 is confined to court-appointed expert witnesses; the rule does not embrace expert advisors or consultants. *Accord Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir.1979); *cf. National Organization for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 545–46 n. 7 (9th Cir.1987) (phrase "court-appointed experts" in 28 U.S.C. § 1920(6), like the counterpart language in Fed.R.Evid. 706, refers only to expert witnesses, not to masters).

This conclusion is buttressed by the text of the advisory committee notes (Notes) accompanying Rule 706. As we read them, the Notes seem geared exclusively to expert witnesses as opposed to technical advisors. For example, they cite "expert witness" cases such as *Danville Tobacco Ass'n v. Bryant–Buckner Assocs., Inc.*, 333 F.2d 202, 208–09 (4th Cir.1964) and *Scott v. Spanjer Bros., Inc.*, 298 F.2d 928, 930 (2d Cir.1962), law review articles such as Levy, *Impartial Medical Testimony–Revisited*, 34 Temp.L.Q. 416 (1961) and Sink, *The Unused Power of a Federal Judge to Call His Own Expert Witnesses*,

29 S.Cal.L.Rev. 195 (1956), and a compendium of "expert witness" litigation. *See* Annotation, *Trial court's appointment, in civil case, of expert witness*, 95 A.L.R.2d 390 (1964). Read thoroughly, the Notes intimate no attempt whatever to reach the subject of non-testifying experts. They do not mention any case or article dealing with that topic. Given the undeniable fact that, at common law, federal trial courts were empowered not only to designate expert witnesses, *e.g., Scott*, 298 F.2d at 930, but to appoint technical advisors as well, *see, e.g., Ex parte Peterson*, 253 U.S. 300, 312–13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920) (Brandeis, J.), the omission of any language limitative of the latter power is, we think, telling.

We acknowledge that the question is not free from all doubt. The government, in support of its argument to the contrary, relies on a statement by two respected commentators that "the provisions of ... Rule 706 operate as restrictions on the judge's common law power to appoint experts." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 706[02] at 706–15 (1988). Yet this statement, we suggest, can—and should—be interpreted to encompass only the appointment of expert witnesses. Indeed, such an interpretation would seem to be contextually indicated, as the very next sentence in the cited text predicts that: "The dissent rather than the majority opinion in a case such as *Scott v. Spanjer Bros., Inc.* would now prevail." *Id.* at 706–15 to –16. In *Scott*, the dissent argued that the lower court erred in appointing an expert witness without giving reasonable notice to the parties. *Scott*, 298 F.2d at 932–34 (Hincks, J., dissenting). It distinguished that situation from one involving the trial judge's inherent power to appoint an auditor—a specie of technical advisor— "whose task it was to organize and report on independent evidence—not to contribute

**5.** The rule provides in pertinent part:

The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection.... A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party,....

Fed.R.Evid. 706(a).

new evidence as does a witness." *Id.* at 934. Judge Hincks appears to have thought that the latter circumstance did not necessitate the same sort of notice to the parties. *Id.* If Rule 706 is, as Weinstein and Berger say, designed to reverse the holding in *Scott* and to elevate the dissent into law, then the rule should be construed consistent with Judge Hincks's view to apply only to expert witnesses and not to those who do not "contribute new evidence."

The substance as well as the language of Rule 706 comports with this interpretation. The rule establishes a procedural framework for nomination and selection of an expert witness and for the proper performance of his role after an appointment is accepted (*e.g.*, advising the parties of his findings, submitting to depositions, being called to testify, being cross-examined). By and large, these modalities—though critically important in the realm customarily occupied by an expert witness—have marginal, if any, relevance to the functioning of technical advisors. Since an advisor, by definition, is called upon to make no findings and to supply no evidence, *see infra* Part II(C), provisions for depositions, cross-questioning, and the like are inapposite. *See Hemstreet v. Burroughs Corp.*, 666 F.Supp. 1096, 1124 (N.D.Ill.1987).[6]

The finishing touch is in the caselaw. The United States, despite herculean efforts, has adverted to no reported cases binding the engagement of technical advisors with the strands of Rule 706. Without exception, the cases cited by the government for the proposition that the rule "sets out the controlling legal standard pertaining to the court's appointment of a neutral expert," Appellant's Brief at 18, are "expert witness" cases, not "technical advisor" cases. *See, e.g., Students of California School for the Blind v. Honig*, 736 F.2d 538, 549 (9th Cir.1984), *rev'd and remanded on other grounds*, 471 U.S. 148, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985); *United*

States v. Weathers, 618 F.2d 663, 664 (10th Cir.), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980); *United States v. Green*, 544 F.2d 138, 142 (3d Cir.1976), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977).

We conclude, therefore, that Rule 706, while intended to circumscribe a court's right to designate expert witnesses, was not intended to subsume the judiciary's inherent power to appoint technical advisors. The Civil Rules, after all, were never meant to become the sole repository of all of a federal court's authority. *See HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 915 (1st Cir. 1988); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986).

### B. *Abuse of Discretion.*

■ The government's immediate fallback position is that, even if literal compliance with Rule 706 was not essential, the district court nevertheless abused its discretion in appointing a technical advisor at all. We concur wholeheartedly that such appointments should be the exception and not the rule, and should be reserved for truly extraordinary cases where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role. *Cf. La Buy v. Howes Leather Co.*, 352 U.S. 249, 255–57, 77 S.Ct. 309, 313–14, 1 L.Ed.2d 290 (1957) (discussing appropriate occasions for employment of special masters); *Reed v. Cleveland Bd. of Educ.*, 607 F.2d at 747 (similar; use of masters permitted where desirable to "bring[ ] to the court skills and experience which courts frequently lack").

We wish to emphasize our strongly-held view that the appointment of a technical advisor must arise out of some cognizable judicial need for specialized skills. Appro-

---

**6.** In *Hemstreet*, the expert's role was that of a technical advisor; the judge "asked [him] to review materials submitted by the parties in connection with various issues raised by those motions to increase the court's understanding of

the technical matters presented." 666 F.Supp. at 1123. Because he was not retained as an expert witness, the court concluded that Rule 706 did not apply to the appointment. *Id.* at 1124.

priate instances, we suspect, will be hen's-teeth rare. The modality is, if not a last, a near-to-last resort, to be engaged only where the trial court is faced with problems of unusual difficulty, sophistication, and complexity, involving something well beyond the regular questions of fact and law with which judges must routinely grapple. Although a technical advisor can be valuable in an appropriate case, the judge must not be eager to lighten his load without the best of cause.

■ Despite the fact that the integument as we have shaped it is a narrow one, *see supra*, we believe that this litigation slips fittingly within it. The case involved esoterica: complex economic theories, convoluted by their nature, fraught with puzzlement in their application, leading to a surpassingly difficult computation of damages. Future-care expenditures and lost earnings had to be projected over a 70–year period—and for an infant with no proven financial track record. Plaintiffs' experts differed among themselves on some points. The stakes were demonstrably high. The government was of small help. Its submission on damages, amounting to little more than a lick and a promise, can best be characterized as feeble. The one-sidedness of the evidence itself lent encouragement to the use of a technical advisor to help the court understand the theories which were bruited about. All in all, the litigation was so far outside the mainstream that the judge, in our estimation, had good reason to energize his inherent power to bring a technical advisor on board. *Cf. Manual for Complex Litigation, Second* (MCL 2d) § 21.54 (1985) (court may consider appointing confidential advisor in "complex litigation" and "when complicated issues are involved"). Mindful of the trier's discretion in this regard, the charge of abuse simply will not wash.

## C. *The Technical Advisor's Role.*

Our decision that this was a seemly case for nominating a technical advisor and that the district court was not bound to comply with the requirements of Rule 706 in making the appointment does not end this phase of our inquiry. The government argues that, whatever may be said of the need for the appointment or its mechanics, the district court permitted Dr. Mead to roam far beyond the precincts to which a technical advisor must properly be confined. In the end, the government hints, the judge abdicated the factfinding function in favor of Dr. Mead, relying on him to resolve the merits. We find that the district court's use of its expert in this case was limited to appropriate technical assistance, and therefore reject the government's plea.

■ We start with a restatement of the principle derived from a watershed case anent technical advisors.[7] In *Ex parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), the Supreme Court recognized that trial judges in the federal system possessed "inherent power to provide themselves with appropriate instruments required for the performance of their duties," including the power to "appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." *Id.* at 312, 40 S.Ct. at 547. *See also* MCL 2d § 21.54 (indicating that court may appoint confidential advisor in complex litigation). Advisors of this sort are not witnesses, and may not contribute evidence. Similarly, they are not judges, so they may not be allowed to usurp the judicial function. *See Kimberly v. Arms*, 129 U.S. 512, 524, 9 S.Ct. 355, 359, 32 L.Ed. 764 (1889) (court may not, through appointment of a master or otherwise, "abdicate its duty to determine by its own judgment the controversy presented"); *see also* MCL 2d § 21.54 (advisors "should not be used to displace the parties' right to a resolution of disputes through the adversarial system"); *cf. La Buy v. Howes Leather Co.*, 352 U.S. at 256, 77 S.Ct. at 313 (special master's role

---

7. Because we are concerned exclusively with the appointment of a "pure" technical advisor, *i.e.*, one who has not been asked to testify or to receive evidence and make findings, neither Fed.R.Evid. 706 nor Fed.R.Civ.P. 53 come into play. *See* text *supra* Part II(A); *see also supra* note 4.

is "not to displace the court"). A judge may not, for example, appoint a legal advisor to brief him on legal issues, since "determination of purely legal questions is the responsibility of the court itself." *Reed v. Cleveland Bd. of Educ.*, 607 F.2d at 747. Neither may a court employ a technical advisor to "undertake an independent mission of finding facts" outside the record of the case. *Johnson v. United States*, 780 F.2d 902, 910 (11th Cir.1986) (citation omitted). In fine, the advisor's role is to act as a sounding board for the judge—helping the jurist to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems.

■ In this case, it does not appear that the district judge stepped over the line. His description of how he used the advisor is illuminating:

> Untrained in the nature and nuances of economic functions, unable to scrutinize the relevance of alleged independent variables or objections thereto, uncertain of the grounds and bounds of valid economic inference, this court recognized its need of a guide to lead it through the maze of economic theory and fact. To this end, [I] decided to adopt the somewhat unusual but not unprecedented procedure of procuring neutral technical advice.

*Reilly II*, 682 F.Supp. at 152. Put another way, the judge wrote that he needed an expert in-house "to advise and instruct [him] on the myriad and arcane aspects of economic science necessary to a just adjudication of the ... case." *Id.* at 155. The judge reported to counsel at a chambers conference that he had explained to Dr. Mead the economist's role as being to function "in the nature of a law clerk," Joint Appendix (J.A.) at 568—someone with whom the judge could engage in "freewheeling discussion." *Id.* at 567. Judge Pettine specifically warned the advisor that if in their discourse "anything developed which I feel I want to use which is apart from the briefs, which may go into an area which the briefs did not discuss, ... I am going to feel an obligation to let counsel

know.... If they want to question you, that is up to them." *Id.* at 569. It is readily apparent that the district court crafted the contours of the engagement with care.

Nor can it validly be argued that the court gave mere lip service to the limitations which it imposed on the advisor's role. The opinion on the merits indicates plainly that the judge neither relied on evidence supplied by Dr. Mead in reaching conclusions in the case nor deferred unduly to the expert in finding the facts. It takes scant analytic insight to see that the court below rejected the calculations of lost earning capacity proffered by the government's expert not because of any new facts or theories introduced by the technical advisor, but because the witness's testimony rested on an inadequate factual and legal basis. *See, e.g., Reilly I*, 665 F.Supp. at 997. Here, as in *Hemstreet, supra*, "the [court's] decision ... was based on the evidence submitted by the parties." 666 F.Supp. at 1123.

Appellant seeks to convince us that the reverse is true by pointing to the judge's statement that he sought an expert to assist him in "reconciling the testimony of at least two outstanding experts who take opposite positions." J.A. 273. This remark, however, proves little. It is, we think, a fair description of what a technical advisor might, with the utmost propriety, undertake. We do not read into it the sinister connotations urged by the government.

■ A second contention hawked by appellant is more troublesome. The government urges that because Dr. Mead received no written instructions and submitted no written report, it is unclear to what extent the district court may have allowed the boundaries to be overrun. We agree that it would have been better practice to document the interchange between jurist and advisor in some more readily retrievable fashion. Yet we perceive no fatal flaw. In a variety of contexts, we have relied on a judge's plausible explanation of his orders, findings, and the like. *See, e.g., United States v. Metropolitan Dist. Comm'n*, 847

F.2d 12, 14 (1st Cir.1988); *Lefkowitz v. Fair*, 816 F.2d 17, 22 (1st Cir.1987); *Advance Fin. Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 26 n. 10 (1st Cir.1984). Here, the record fully supports the judge's explanation of how he used Dr. Mead's services, and the government has offered no cogent reason to doubt this explanation. Just as we have taken cognizance of, and deferred to, the trial judge's "special role ... in elucidating the meaning and intendment of an order which he authored," *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1066–67 (1st Cir.1987), we have complete confidence in the accuracy of Judge Pettine's recital. *Accord Johnson v. United States*, 780 F.2d at 910 (district judge's "outside research" not reversible error because "judge stated he did not rely on those outside sources in reaching his conclusions and this appellate court relies on those representations").

■ Appellant's complaint that it was deprived of any opportunity to cross-examine Dr. Mead appears asthenic. If, as the district court stated, the advisor was not an evidentiary source, there was neither a right to cross-question him as to the economics of the situation nor a purpose in doing so. And, to the extent that it might have profited the government to grill Dr. Mead about his role in the case, the short and simple response is that, after being informed at the April 10 chambers conference that the district court intended to hire a technical advisor, the prosecutors did not ask for written specification of the advisor's anticipated role or attempt to reserve a right of inquiry. Even after the verdict was rendered and an objection belatedly interposed to use of the advisor, the government did not move for leave to question him. Having failed to raise that point below, the United States cannot raise it for the first time on appeal. *See Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 896 (1st Cir.1988) (assignment of error untimely where "appellant did not raise the matter below"); *Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (similar; collecting representative First Circuit cases); *cf. Johnson v. United States*, 780 F.2d at 910 (government's failure to object to court's "outside research" during trial constituted procedural default).

In sum, we find the record to be consistent with the district court's announced employment of Dr. Mead as a technical advisor. There is, moreover, simply no reasoned basis on which we can conclude that, once he was engaged, the advisor's performance of his functions strayed beyond the proper ambit of his role. The government's insistence to the contrary is comprised of little more than self-serving speculation and self-interested surmise.

### D. *Procedural Safeguards.*

Appellant has one remaining shot in its sling. It protests vigorously that, even where a technical advisor may appropriately be engaged by a trial judge outside the realm of Rule 706, fundamental fairness requires that the appointment be hedged about with a panoply of procedural safeguards. Among other things, appellant urges that the district court should have given advance notice to the parties of the expert's identity and how he was to be used; that written instructions should have been prepared regarding the expert's duties; and that Dr. Mead should have been required to file a written report. We are quick to acknowledge that these suggestions have some merit.

■ We think it advisable in future cases that the parties be notified of the expert's identity before the court makes the appointment, and be given an opportunity to object on grounds such as bias or inexperience. *Cf. Hemstreet*, 666 F.Supp. at 1124 (technical advisor nominated by parties, who agreed on his independence and expertise). We also think that there is much to commend the preformulation of a written "job description" for the advisor (or in lieu thereof, that the judge deliver comprehensive verbal instructions to the advisor, on the record, in the presence of all counsel). At the conclusion of his stint, the advisor should file an affidavit attesting to

his compliance with the job description.[8] And we do not regard such matters as mere ritual; in an appropriate case, we would not hesitate to reverse if procedural safeguards were wholly inadequate.

■ Our belief in the value of such prophylactic measures, however, does not avail the government here. On April 10, the district court advised the parties that it had received permission from the paymasters in Washington to employ a technical advisor and that it had staged preliminary discussions with the intended appointee. The government did not inquire as to the expert's identity or express any objection to the court's use of an (unknown) expert; indeed, the United States Attorney, himself in attendance at the conference, appeared affirmatively to agree.[9] Nor did the government request that any safeguards be set in place. The record makes manifest that appellant sat back and knowingly acquiesced in the court's unconditional hiring of an unidentified technical advisor. This was, we think, a waiver. *See Johnson,* 780 F.2d at 910; *see generally Irons v. FBI,* 811 F.2d 681, 686 (1st Cir.1987) (describing waiver as "the purposeful relinquishment of an appreciated right" and noting that it "can fairly be deduced from conduct"). *Cf., e.g., Wells Real Estate v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 811 (1st Cir.) (argument that trial court should have made preliminary determination waived by failure to request such action below), *cert. denied,* — U.S. —, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988); *Central Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377, 381–82 (5th Cir.1981) (by failing to protest before jury discharged, party waived objection to special interrogatory that, in retrospect, submitted question of law due to conjunctive phrasing); *Nimrod v. Sylvester,* 369 F.2d 870, 873 (1st Cir. 1966) (plaintiff who sat by when court neglected to answer jury request for supplementary instruction could not complain on appeal; because "unawareness" was "of [counsel's] own making," resultant error was waived).

Not only is there waiver here, but it is aggravated by an element of sandbagging. The government, knowing of the court's plan to consult with a technical advisor, waited to see which way the wind blew. Only when the case turned out disastrously from the government's viewpoint did appellant decide to voice its litany of concerns about the circumstances of the appointment. The record shows no valid reason why the United States, on April 10 or within a reasonable time thereafter, could not have objected to the hiring of any expert, demanded the name of the court's candidate, or requested layer upon layer of special swaddling. Certainly, the government has offered us no persuasive reason to explain—let alone excuse—its lassitude. In our view, when a trial judge announces a proposed course of action which litigants believe to be erroneous, the parties detrimentally affected must act expeditiously to call the error to the judge's attention or to cure the defect, not lurk in the bushes waiting to ask for another trial when their litigatory milk curdles. *See Pearson v. Fair,* 808 F.2d 163, 166 (1st Cir.1986) (per curiam); *cf. James v. Watt,* 716 F.2d 71, 77–78 (1st Cir.1983) (upholding denial of motion to amend where plaintiffs waited

---

**8.** We disagree with the suggestion that a technical advisor should be required, as a matter of course, to write a report. The essence of the engagement, *see* text *supra,* requires that the judge and the advisor be able to communicate informally, in a frank and open fashion. Given the freewheeling nature of the anticipated discourse, and the fact that the advisor is not permitted to bring new evidence into the case, requiring a written report in every case would serve no useful purpose.

**9.** As the court was explaining its desire to name a technical advisor, the following colloquy took place:

THE COURT: As I implied before, ... it is a rare occurrence in the Federal judicial [system] that matters of this kind [occur] and I feel that I wanted some further expertise over and above what was involved as far as general concepts. I think I've got one idea and I don't know whether or not it is worth the time of day but I want to explore them.

[THE U.S. ATTORNEY]: Sure. We were thinking the same way.

J.A. 573.

until they lost their case before making motion), *cert. denied*, 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). To hold otherwise "would place a premium on agreeable acquiescence to perceivable error as a weapon of appellate advocacy." *Merchant v. Ruhle*, 740 F.2d 86, 92 (1st Cir. 1984). We will not permit the government to stack the deck in this fashion.

We have weighed the contention, advanced in appellant's reply brief, that it was informed only of the district court's *intention* to hire a technical advisor. It asserts that it was never informed on April 10, or soon thereafter, that the court had in fact hired such a person. Therefore, the newfound thesis runs, the only real opportunity appellant had to object came after the decision eventuated in *Reilly I*. We find this logomachy to be entirely disingenuous. The district court's statement of intent was more than sufficient to put the government on notice. Being on notice and doing nothing, it strikes us as not unfair that appellant should suffer the consequences.

██ Appellant's last gasp on the point invokes the rubric of plain error. Concededly, we have the power to overlook many waivers or procedural defaults in cases where a gross miscarriage of justice would otherwise prevail or where the integrity of the judicial process is seriously threatened. This is not such an instance. The district judge has satisfactorily explained the reasons why he sought to engage a technical advisor, and they are proper reasons. There is no suggestion of bias or any other disqualifying characteristic on the expert's part. And the judge's account of the manner in which the advisor's services were employed comports with the appropriate dimensions of the role and matches what can fairly be deduced from the record. There is no sign that justice was thwarted.

We need beat this drum no more. "Courts, like the Deity, are most frequently moved to help those who help themselves." *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 989 (1st Cir.1988). Appellant's

argument is procedurally defaulted. *Accord Johnson*, 780 F.2d at 910.

## III. THE COLLATERAL SOURCE CONUNDRUM

The FTCA requires resort to state substantive law, that is, "the law of the place where the [tortious] act or omission occurred." 28 U.S.C. § 1346(b). This statutory directive has consistently been interpreted to require that damages in an FTCA suit—with a few exceptions not germane at this point—must be assessed in conformity with state law. *See, e.g., Flannery v. United States*, 718 F.2d 108, 110 (4th Cir. 1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984); *Smith v. Pena*, 621 F.2d 873, 880 (7th Cir.1980); *Felder v. United States*, 543 F.2d 657, 665 (9th Cir.1976). The parties agree that Rhode Island is the relevant state for purposes of this case.

At common law, Rhode Island jurisprudence took a fairly conventional view of collateral sources in tort cases. The rule was—and remains—

> that, absent a statutory provision to the contrary, the amount of recovery from one responsible for another person's injury will not be reduced by the amount received from a collateral source by the plaintiff. . . .

*Soucy v. Martin*, 121 R.I. 651, 402 A.2d 1167, 1170 (1979); *see also Oddo v. Cardi*, 100 R.I. 578, 218 A.2d 373, 376–77 (1966); *see generally Restatement (Second) of Torts* § 920A(2), comment b (1979).

The government contends that such a statutory exception is applicable in medical malpractice cases, including this one. The statute in question, now codified as R.I. Gen.Laws § 9–19–34.1, was amended slightly in 1986. Before then, the statute was codified as R.I.Gen.Laws § 9–19–34. Because the pre–1986 version applies to this case, we refer exclusively to it, leaving the amendment and recodification to one side. As written, the Rhode Island law provided in pertinent part:

> [I]n an action for personal injury against a licensed physician, hospital, clinic, health maintenance organization or pro-

fessional service corporation ... based upon professional negligence, [the defendant] may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States social security act, any state or federal income disability or workers' compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services.

R.I.Gen.Laws § 9–19–34. The statute further stipulated that a plaintiff may introduce evidence of amounts contributed to secure such benefits in mitigation of the offset. *See id.*

The government seeks to employ § 9–19–34 to reduce the award against it by the amounts which would be paid for Heather's care from three federal or partly-federal programs: the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), *see* 10 U.S.C. §§ 1079, 1086, Medicaid, and the Education of All Handicapped Children Act (EAHCA), 20 U.S.C. § 1411 *et seq.* The district court rejected this argument on dual grounds. First, it concluded that because the United States was not an enumerated entity under the state law, and was not one of the class of defendants (health care providers who purchase malpractice insurance) which § 9–19–34 was designed to assist, the statute had no application in this case. *Reilly I,* 665 F.Supp. at 1012. The district court ruled, alternatively, that even if § 9–19–34 applied, defendant was not entitled to an offset inasmuch as it had failed to prove the amount of the proposed deductions. *Id.* We review both holdings.

### A. *Scope of § 9–19–34.*

The district court erred in concluding that § 9–19–34 was unavailable to the federal defendant in this case. The FTCA, not the letter of the Rhode Island statute, is the focal point of this inquiry and is determinative of the question. The intent of the Rhode Island General Assembly is, in a very real sense, irrelevant to the extent of the federal government's liability in an FTCA suit. Local law "informs how a private party would be treated; it does not tell us, indeed it cannot, the extent to which the federal government has waived its sovereign immunity." *Lucas v. United States,* 807 F.2d 414, 417 (5th Cir.1986).

The FTCA provides that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Because a provider of medical services in the private sector would in "like circumstances" be eligible for a reduction of damages based on payments by collateral sources, *see* § 9–19–34, the United States—which in this context can only be liable "to the same extent" as the private health-care provider—must be entitled to exactly the same largesse. *Accord Scheib v. Florida Sanitarium and Benevolent Ass'n,* 759 F.2d 859, 861 (11th Cir. 1985) (applying a similar Florida statute to reduce the federal sovereign's liability); *see also Taylor v. United States,* 821 F.2d 1428, 1431–32 (9th Cir.1987) (allowing federal government to avail itself of California statute limiting noneconomic damages even though government not a "health care provider licensed by the state," as statute required), *cert. denied,* — U.S. —, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988); *Lucas v. United States,* 807 F.2d at 417 (extending analogous Texas statute to limit liability of federal government); L. Jayson, *Handling Federal Tort Claims* § 228.02, at 10–30 to –33 (1988).

We conclude that where Rhode Island law is to be applied in a medical malpractice case brought under the FTCA, the federal sovereign may avail itself of R.I. Gen.Laws § 9–19–34 to the same extent as could a hospital or other similarly-situated health-care provider in kindred circumstances. In a case like this, therefore, defendant was enfeoffed to introduce evidence of benefits received by the plaintiffs from collateral sources on account of the injuries and damages at issue, so long as those benefits fell categorically within the

genre of benefits contemplated by the state statute.

### B. *Entitlement to Offset.*

 Although § 9–19–34 applies in this case, nothing turns on it. We agree with the district court that the government "utterly failed" to meet its burden under the law. *Reilly I,* 665 F.Supp. at 1012. We explain briefly.

The state statute requires defendants who are desirous of spreading its soothing unguent to "introduce evidence of any *amount* payable as a benefit to the plaintiff." R.I.Gen.Laws § 9–19–34 (emphasis supplied). In this case, appellant elicited only general allusions to plaintiffs' possible eligibility to receive benefits. The district court found that the government "failed to develop any meaningful evidence as to the extent of the Reillys' eligibility for CHAMPUS payments or for aid under the [EAHCA]," *Reilly I,* 665 F.Supp. at 1013, despite being "afforded several opportunities to elicit proof on this issue, both at trial and at a separate hearing held on May 5, 1987." *Id.* In the absence of mistake of law (and there is none on this point), we review this finding only for clear error. *See generally RCI Northeast Services Div. v. Boston Edison Co.,* 822 F.2d 199, 201–02 (1st Cir. 1987); Fed.R.Civ.P. 52(a).

We have canvassed the record with painstaking care and decide, without serious question, that this finding was not clearly erroneous.[10] The situation, we think, is straightforward: the statute required evidence of the "amount[s] payable" as collateral benefits; defendant had the burden of proving the amounts; it introduced no real evidence to meet this burden. The district court could not be expected to reduce the award without (i) knowing the amount by which the government contended that damages should be reduced, and (ii) being afforded some proof of that sum. *Cf. Siverson v. United States,* 710 F.2d 557, 560 (9th Cir.1983) (affirming district court's refusal to deduct Medicare payments from damage award where federal government failed to carry burden of proving amount of benefits to be received). The district court's declination to reduce plaintiffs' recovery on account of collateral sources may stand.[11]

## IV. LOST EARNING CAPACITY

The district court awarded Heather Reilly $1,104,641 for lost earning capacity. *Reilly I,* 665 F.Supp. at 1008. That she is totally and permanently incapacitated from performing gainful employment is beyond dispute. Nevertheless, the government questions the award on several grounds. Only a few warrant discussion.

### A. *Duplication.*

Appellant's assertion that the award for lost earnings replicates the award for future-care expenses, requiring the government to pay for Heather's living expenses twice, is an innovative one. At the outset,

---

**10.** We need not consider the government's oblique references on appeal to some imagined set-off referable to Medicaid payments. Insofar as we can tell from the record, such an argument was never explicitly raised in the trial court. It is, therefore, waived. We note nonetheless that, even apart from waiver, the point seems of dubious relevance. This appeal does not involve reimbursement for past medical expenses, and there is nothing to suggest that Medicaid will afford coverage for future expenses after collection of the judgment. Moreover, as with CHAMPUS and EAHCA benefits, appellant never proved the amount of the putative Medicaid offset.

**11.** Because we conclude that the government did not prove its entitlement to an offset under state law, we need not reach the interesting question as to whether CHAMPUS and EAHCA benefits come within the purview of an exemptive statute such as R.I. Gen. Laws § 9–19–34. We do note in passing that these programs seem strangely far afield from conventional "collateral sources," and that at least one circuit has ruled that CHAMPUS payments do not qualify for offset under a collateral source law. *See Mays v. United States,* 806 F.2d 976, 977 (10th Cir.1986) (CHAMPUS payments, because they derive exclusively from general federal revenues are not from a source "collateral" to the federal government), *cert. denied,* ── U.S. ──, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987). Inasmuch as we are reluctant to scratch intellectual itches purely for their own sake, we take no view as to the interplay between CHAMPUS and EAHCA benefits, on the one hand, and § 9–19–34, on the second hand, in a properly-documented FTCA case.

appellant concedes the general proposition that Rhode Island law allows an injured party to recover for both prospective loss of earning capacity and future health-care expenses. *See, e.g., Caron v. United States,* 548 F.2d 366 (1st Cir.1976) (affirming award in FTCA case for both lost earning capacity and future care; applying Rhode Island law); *cf. Foskey v. United States,* 490 F.Supp. 1047 (D.R.I.1979) (awarding damages in FTCA case for lost earning capacity and future-care expenses; applying Pennsylvania law). On their face, the two seem separate and distinct elements of damage, each of which ought properly to be recoverable if competently proven and caused by a tortfeasor's negligence. This is especially so because Rhode Island jurisprudence adopts the outlook that damages are awarded in tort cases in order fully and adequately to compensate an individual for injuries sustained. *See Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 922 (D.R.I.1983) (applying Rhode Island law); *see also Duffy v. Yellow Cab Co.,* 79 R.I. 363, 82 A.2d 822, 825 (1951) (injured party "is entitled to be made whole as far as that can be accomplished reasonably by a money award"). Yet the government importunes that, in a case such as this, the general proposition should admit of an exception because the twin awards—lost earning capacity and future-care expenses—are inherently duplicative.[12]

Appellant's asseveration stems from the decision of a divided panel in *Flannery v. United States,* 718 F.2d 108 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984). Raising the point *sua sponte,* the *Flannery* court ruled on somewhat analogous facts that awards of future-care expenses and anticipated lost earnings in effect required the government to pay plaintiff's personal living expenses twice, and should be offset. *Id.* at 112–13. There was a vigorous dissent. *See id.* at 113–15 (Hall, J., dissenting). Writing for the majority, Judge Haynsworth explained:

In the usual case, a living plaintiff must pay his own living expenses, though an award for lost earnings may be the source of his funds. In [the case of a permanently comatose plaintiff], however, the plaintiff will be required to pay nothing, for the award of future medical expenses includes all of the personal expense that the plaintiff will incur. Indeed, the testimony was that, in the future, he will need little skilled medical care. His personal expenses will be to provide himself with housing, food, and nursing and custodial care of the kind provided in a nursing home. That is the expense covered by the award for future medical expense. The label should not be permitted to mislead us, for, in truth, the judgment requires the United States to pay the plaintiff's personal living expenses twice. Thus, the award for lost earnings, as finally determined, should be reduced by the amount of the award for future medical expenses.

*Id.* at 112–13. The majority cited no precedent for its ruling; and insofar as we can determine, the decision has only been followed by a single district court within the Fourth Circuit. *See Corrigan v. United States,* 609 F.Supp. 720, 733 (E.D.Va.1985), *rev'd on other grounds,* 815 F.2d 954 (4th Cir.1987) (per curiam). Certainly, appellant has called our attention to no other authority approving, or otherwise supportive of, *Flannery.*

In the present case, the district court declined to accord suzerainty to *Flannery,* concluding that the future-care expenses and lost earning capacity were not unavoidably duplicative. *Reilly I,* 665 F.Supp. at 988–89. Judge Pettine reasoned that, in this case "[t]he medical expenses do not cover the personal expenses the plaintiff would have incurred in earning her living, such as housing, food, and clothing." *Id.* at 989. In short, the judge refused to

---

**12.** That the law frowns on permitting an injured plaintiff to obtain full recovery twice for the same damages is not much in doubt. *See, e.g., Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1345 (1st Cir.1988) ("a plaintiff is entitled to only one full recovery, no matter how many different legal grounds may support the verdict"); *Westerman v. Sears, Roebuck & Co.,* 577 F.2d 873, 879 (5th Cir.1978) (the "law does not sanction double recoveries"); *Muise v. Abbott,* 160 F.2d 590, 592 (1st Cir.1947) (similar).

equate the nursing and custodial care which Heather would require with what would have been spent on "personal" expenses out of her net future earnings had the doctor's negligence not disabled her. He concluded that, on balance, "these are two separate and distinct compensable losses." *Id.* We find this conclusion to be supportable for two reasons.

■ 1. *Flannery: Shaky Underpinnings.* In the first place, we doubt the wisdom of the *Flannery* rule—a "rule" which, with respect, is little more than an ipse dixit. To be sure, the prudential policies which underlie the law of torts are uncomfortable with the prospect of windfalls: compensatory damages are meant to compensate, and duplicative recoveries, which by definition overcompensate, are disfavored. *See supra* note 12. Yet, duplication cannot entirely be avoided. Every time that a tort claimant is hospitalized for treatment of injuries, she "saves" on certain personal expenditures. Her meals are provided by the hospital, thus reducing her food budget; she spends her time in a hospital gown, thus reducing her dry cleaning expense; utilities come with the accommodations, thus minimizing the costs of heat, light, and power at her residence. Despite this "duplication," it has never been suggested that the tortfeasor should be allowed to insist that his victim account for these savings and deduct them from the amount of the hospital bill when proving her damages.

The reasons why such offsets are not accepted practice, we suggest, have both pragmatic and equitable roots. From a practical standpoint, the difficulties in attempting to prove such offsets are enormous. Unless we are prepared to say that damages must now be proved with slider-ule precision—an approach which this court has never adopted, *see, e.g., Knightsbridge*

*Marketing Services, Inc. v. Promociones y Proyectos, S.A.,* 728 F.2d 572, 575 (1st Cir. 1984) (disavowing "mathematical accuracy" as a prerequisite to upholding damage computations)—it makes very little sense to devote the overtaxed resources of court, jury, and litigants to a search designed to sanitize every penny of consequential expense and certify it as altogether free from the taint of duplication. Once that rationale is accepted, equity comes into play. As a matter of simple justice, it is far fairer to give the injured plaintiff the benefit of what small duplication may inevitably occur than to confer the trouvaille upon the wrongdoer.[13]

In view of these concerns, we find *Flannery* to rest on very shaky underpinnings and decline to adopt it as a model for this circuit.

■ 2. *No Clear Error.* Because the case at bar is distinguishable from *Flannery,* affirmance of the allegedly duplicative portion of the award does not depend entirely upon our willingness to repudiate the *Flannery* principle. In *Flannery,* the duplication was apparently not disputed, arguably due to the fact that plaintiff's condition was such as to require "little skilled medical care" during the remainder of his life. *Flannery,* 718 F.2d at 112. Our perscrutation of the present record indicates that the same situation does not obtain. Heather will require continuing care, some of it highly sophisticated. *See, e.g., Reilly I,* 665 F.Supp. at 1002–04 (discussing necessity for ongoing round-the-clock nursing care and awarding $5,753,-853, after discounting to present value, for such care). Moreover, the district court's award of future-care expenses does not necessarily provide for the living expenses which Heather, *qua* wage-earner, would have had to pay. The district court perspi-

---

**13.** The collateral source doctrine illustrates much the same principle. That doctrine, still widely in force, generally allows recovery against a wrongdoer for the full amount of damages even though the injured party is also compensated for some or all of the same damages from a different source independent of the tortfeasor (and whose payment, therefore, is "collateral" to him). A principal justification

for the rule is that "the wrongdoer does not deserve to benefit from the fortuity that the plaintiff has received or will receive compensation from a[n] [independent] source...." *Overton v. United States,* 619 F.2d 1299, 1306 (8th Cir.1980). Since one party or the other will receive a windfall in such a situation, it is intuitively more just that the windfall accrue to the injured person as opposed to the wrongdoer.

caciously noted this lacuna. *Reilly I*, 665 F.Supp. at 989. There is, for instance, no suggestion that the future-care damages will provide Heather with a home in the traditional sense, or with normal food, clothing, or transportation. The extent to which there is an overlap—and we freely concede that some imbrication is probable, if not inevitable [14]—is most often appropriate for resolution on the trial, rather than appellate, level.

The question of whether—and if so, to what extent—the challenged components of the award are unjustly duplicative is, in this case, principally one of fact. That being so, we review the trier's factfindings, including the determination of damages, only for clear error. *See, e.g., United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 763 (1st Cir.1985); *Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir.1984); *see generally* Fed.R.Civ.P. 52(a). Even if the duplicate damage question in this case is seen as a "mixed" question of fact and law, the standard of appellate scrutiny remains the same. *See RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d at 202; *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 794 (1st Cir.1982). We have stressed, time after time, that "this criterion is a deferential one." *Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 462 (1st Cir.1988). "As we have said before, 'once the fact of damage is established, the trial judge [in a bench trial] has much latitude in fixing the amount....'" *Id.* at 474 (quoting *Rivera Morales v. Benitez de Rexach*, 541 F.2d 882, 886 (1st Cir.1976)).

Here, there may well have been, as appellant argues, various permissible views of the proof vis-a-vis the purportedly duplicative nature of plaintiffs' recovery. Yet it was the district judge's prerogative, indeed, his duty, to choose among these conflicted inferences. From aught that appears, he did his duty: he concluded that there was no impermissible doubling of

damages as contended by the government; the supposedly overlapped components were "separate and distinct." *Reilly I*, 665 F.Supp. at 989. We have reviewed the judge's handiwork and are left with no "definite and firm conviction that a mistake has been committed." *RCI Northeast*, 822 F.2d at 203 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Therefore, we decline to disturb the award in this respect.

### B. *Calculation of the Award.*

The government insists that the district court's calculation of lost earning capacity was flawed in divers ways. We analyze the three most promising of these initiatives.

1. *Delayed Entrance into the Labor Market.* Notwithstanding that the lower court purported to project a future income stream and to discount the product to present value, *Reilly I*, 665 F.Supp. at 989–97, appellant says that the court stumbled in neglecting to discount the calculation a second time. The double dip is essential, the thesis runs, in order to animate the stipulated assumption that the stream *would not flow* until the year 2007 (when Heather would presumably have entered the labor force). This assertion draws whatever vitality it may possess from a footnote in *Nemmers v. United States*, 795 F.2d 628, 633–34 n. 2 (7th Cir.1986). There, the trial judge's present value calculation required further adjustment because it had not been discounted to take cognizance of delay in commencement of an income stream. *Id.*

Our quarrel is not with the *Nemmers* court but with the government. In the case at bar, unlike in *Nemmers*, plaintiffs' expert took account of the late-entry assumption in his original discounting, by discounting back from each year's earnings, beginning in year 2007. *See Reilly I,*

14. The imbrication can occur, as the government points out, in at least two ways. First, because of her future-care program, Heather will never incur certain expenses which would have fallen to her in the work place. Second,

the program itself affords what might be termed an alternative (if tragic) lifestyle, thereby offering what would be viewed as in-kind replacement, prepaid, for certain elements of the lifestyle which Heather might otherwise have had.

665 F.Supp. at 996. The district court, supportably, relied upon the calculations of this expert. Given that, in a case tried to the bench, the judge has considerable leeway in choosing among the views of experts and in determining the weight and value to be assigned to the opinions of each expert, *see, e.g., Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n,* 814 F.2d 32, 40 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987), we cannot say that the discounting method adopted by the district court was clearly erroneous.

■ 2. *Heather's Gender.* The government also argues that the calculation of Heather's prospective lost earnings was defective because it assumed Heather would have been active in the work force for 48 years. In effect, appellant tells us that the trial court erred in rejecting certain Bureau of Labor Statistics (BLS) work/life tables relied upon by the defense expert. These tables showed that a person of Heather's age, sex, and assumed education level would, on average, work for only 28 years. Rather singlemindedly, the government expostulates that because it offered evidence (the tables) to support a reduction on this order of magnitude, and no evidence of inaccuracy was presented, the district court was powerless to reject the figures and abjure the diminution. We disagree.

We begin by remarking that appellant's theory is questionable as a matter of fact. In an environment where more and more women work in more and more responsible positions, and where signs of the changing times are all around us, it can no longer automatically be assumed that women will absent themselves from the work force for prolonged intervals during their child-bearing/child-rearing years. Yet we need pursue neither the sexist aspects of the point nor the antiquated premise upon which it rests—for the government's theory is also wrong as a matter of law.

In this case as in so many others, the district court, while bound to consider the government's expert testimony as to Heather's expected work-life, was not required to accept it. Tables of this sort "are

merely guides to assist a court or jury in arriving at its verdict." *Gonyer v. Russell,* 160 F.Supp. 537, 540 (D.R.I.1958). They "are not inflexible rules which the [trier] must follow." *Renaldi v. New York, New Haven & Hartford R.R. Co.,* 230 F.2d 841, 845 (2d Cir.1956); *see also Monessen S.W. Ry. Co. v. Morgan,* —— U.S. ——, 108 S.Ct. 1837, 1845 n. 10, 100 L.Ed.2d 349 (1988). In a bench trial, statistical compendia used by experts—such as the BLS compilation—are tools to help the court in constructing a reasoned, fair decision; they are not handcuffs to shackle its power to find the facts and resolve conflicts in the evidence. In this instance, appellees offered testimony through their own experts that Heather would likely have worked for 48 years. *Reilly I,* 665 F.Supp. at 997. The judge accepted this opinion evidence. He was entitled to do so.

Death and taxes, arguably, may be certain; statistics, though often a valuable predictive aid, usually are not. The district court did not commit clear error in refusing to yield to the government's suggested assumption that a woman, invariably, works less and, therefore, earns less than her male counterpart.

■ 3. *The Experts' Worksheets.* A further aspect of the attack on lost earnings relates to the government's complaint that it was never allowed to see the work papers of plaintiff's economists, Drs. Wright and Greene. That is apparently true—but a party cannot legitimately complain of lack of access to worksheets when it never seasonably requested such access. We have combed the record with meticulous attention to detail and find that, although the AUSA asked for Dr. Green's work papers during his deposition to no avail, there was no appropriate follow-through. The deposition was not adjourned; the AUSA filed no motion to compel the witness to produce the materials, *see, e.g.,* Fed.R.Civ.P. 37(a), or for sanctions, Fed.R.Civ.P. 37(b)(2); and the United States never asked for the experts' work papers in the conventional manner, that is, by a request for production under Fed.R.Civ.P. 34. All in all, given the govern-

ment's torpor, we cannot improve upon the district court's summary of the situation:

> Defense counsel never filed a request for production, nor did he seek access to the economists' work sheets on cross-examination. In short, the defense counsel's failure to obtain the reports of which he complains cannot be attributed to his lacking an opportunity to conduct full discovery.

*Reilly I*, 665 F.Supp. at 999.

We have also examined appellant's contention that it sought additional discovery in respect to the economists on the eve of trial, thus resurrecting its claim to the worksheets. Despite appellate counsel's misleading characterizations of what transpired below, the record refutes the claim. In particular, the transcript of the pertinent hearing before the magistrate reflects that the government, having previously deposed the economists, was allowed to reinterview Dr. Wright. Upon inquiry by the magistrate, the AUSA mentioned that, notwithstanding the interview, "[o]ne phase of the information was not supplied, ... and I want to question [the economist] on it." Hearing Transcript (Oct. 24, 1986) at 45. No other discovery requests were voiced. When asked to specify the "one phase," the AUSA stated: "It is relative to the so-called claim of lost wages of the husband [Peter Reilly]." *Id.* Plaintiffs denied that they were pressing any such claim, *id.* at 46, and agreed not to introduce testimony as to any such losses. *Id.* at 46–47. When questioned as to whether that stipulation ended the matter, the government's lawyer equivocated. The magistrate then stated:

> [I]f you want, [within the next few days], give me specifically what you would like, okay, and the reason that you need it, okay, I will make a ruling and if I rule in your favor, the answer is there is no question you'll get the right to depose this individual prior to him testifying, ...

and if it is some area that there's a hole and you have got to fill in the hole, I can tell you right now I'm going to let you fill in the hole.

*Id.* at 52. The magistrate added:

> [Tell me] specifically what you're lacking and why you need it, and don't make it very formal, I'm not looking for something extremely formal. Right now, I [am] shooting in the dark.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> ... [W]hat I'm saying to you, I'd like to know what you want, ... and the reason why you want it.

*Id.* at 53. From what appears of record, it seems that the government never made any such further specification to the magistrate or to the district court.

This, we think, ends the matter. "The law ministers to the vigilant not to those who sleep upon perceptible rights. [A] litigant ... cannot routinely be rewarded for somnolence and lassitude." *Puleio v. Vose*, 830 F.2d 1197, 1203 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988). The absence of a timely and proper demand for the economists' worksheets disqualified the government from assigning error to nonproduction of the papers. And by ignoring the magistrate's clear invitation to specify, face-up and squarely, what information it continued to seek, appellant waived the right to protest the denial of its eve-of-trial request to conduct further discovery.

## V. AVAILABILITY OF A STRUCTURED PAYOUT

The government makes two arguments which are related in the sense that both implicate the idea of a structured payout of damages, that is, an award payable over time in periodic installments.[15] In its first sally, the United States suggests that the district court erred in ruling that it was obligated to make the award of damages in

---

15. We need not dwell on the theoretical underpinnings or suggested structure of such "periodic" awards. We refer the reader with a thirst for further detail to the considerable literature on the subject. *See, e.g.,* Plant, *Periodic Payment of Damages for Personal Injury*, 44 La.L. Rev. 1327 (1984); Rea, *Lump–Sum Versus Peri-* *odic Damage Awards*, 10 J. Legal Studies 131 (1981); Kolbach, *Variable Periodic Payments of Damages: An Alternative to Lump Sum Awards*, 64 Iowa L.Rev. 138 (1978). Nor need we remark the well-deserved popularity of structured *settlements* in sizable personal injury cases involving large sums of money.

the form of a lump sum. Should this onslaught fail, appellant's backup position is that the court ought to have calculated the size of the verdict in reliance upon the cost of purchasing an annuity sufficient to yield periodic payments mirroring the damages sustained. Neither contention is convincing.

### A. *Form of Award.*

■ On the first point, the district court concluded that, "in the absence of an agreement by the parties to structure the future-care award, the law leaves the court with no alternative but to order the payment of a lump sum judgment." *Reilly I,* 665 F.Supp. at 1016. The government's argument that the award could have been made in the form of a structured payout, rather than a lump sum, seems to have been plucked from thin air.

To our knowledge, the only other circuit which has directly addressed this issue in the context of an FTCA suit concluded that the common law rule—to the effect that a court's authority to award damages for personal injuries is limited to making lump-sum judgments—controls "unless and until Congress shall authorize a different type of award." *Frankel v. Heym,* 466 F.2d 1226, 1228–29 (3d Cir.1972); *see also Elliott v. United States,* 329 F.Supp. 621, 628 (D.Me. 1971) (similar); L. Jayson, *supra,* § 225, at 10–5; *cf. Slater v. Mexican Nat'l R.R. Co.,* 194 U.S. 120, 128, 24 S.Ct. 581, 583, 48 L.Ed. 900 (1904) (Holmes, J.) (court lacked power to substitute lump sum, representing estimated present value of benefits awarded, for periodical payments mandated by governing statute). In *Gretchen v. United States,* 618 F.2d 177 (2d Cir.1980), the Second Circuit reached the same conclusion in a suit implicating section 2 of the Public Vessels Act, 46 U.S.C.App. § 782, noting that, "absent specific legislative authority, it is generally regarded as beyond the power of a court to fashion [a variable-annuity type of] remedy." *Id.* at 181 n. 5. *See also Stineman v. Fontbonne College,* 664 F.2d 1082, 1089 (8th Cir.1981) (instructing that damage award should be paid in cash unless plaintiff elects otherwise). The government admits that Congress has never enacted legislation permitting the routine imposition of structured payouts in lieu of lump-sum damage awards [16] and—for what, if any, relevance it may have—Rhode Island has not passed such a law.

The authorities advanced by the United States do little to aid its position. The one sentence statement in *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 533, 103 S.Ct. 2541, 2548, 76 L.Ed.2d 768 (1983) (dictum), upon which appellant places greatest emphasis, in our judgment comforts appellees more. The whole of the highlighted sentence reads as follows: "The award could in theory take the form of periodic payments, but in this country *it has traditionally taken the form of a lump sum, paid at the conclusion of the litigation.*" *Id.* (emphasis supplied; footnote omitted). Many things are possible "in theory"—*e.g.,* moving faster than a speeding bullet, leaping tall buildings at a single bound—but to transform theoretical possibility into actuality, without the faintest shred of precedential support, is a feat more suited to disciples of Blackstone on Magic than to students of Blackstone's Commentaries. The carefully landscaped terrain of the FTCA allows for no such necromancy to be practiced.

---

**16.** Periodic damage awards are permissible in lieu of lump sums in certain situations. They can be made, for instance, if a controlling statute permits, *see, e.g.,* Fla.Stat.Ann. § 768.51(1)(b) (West 1986); Cal.Civ.Proc. Code § 667.7(a) (West 1987); Wis. Stat. Ann. § 655.015 (West 1980 & Supp. 1988); *see also Slater v. Mexican Nat'l R.R. Co.,* 194 U.S. at 128, 24 S.Ct. at 583 (judicial decree should take the form of periodical payments as directed by controlling statute). Such an outcome can also be achieved by agreement of the parties in interest, *see, e.g., Godwin v. Schramm,* 731 F.2d 153, 157–58 (3d Cir.) (discussing, inter alia, techniques of structured settlement), *cert. denied,* 469 U.S. 882, 105 S.Ct. 250, 83 L.Ed.2d 187 (1984), or where a trust, annuity, or other prophylactic arrangement is necessary to ensure that the injured party will in fact receive his due, *see, e.g., Nemmers v. United States,* 795 F.2d at 636 ("[i]f the court perceives that a victim's relatives will abandon [him] or dip into the award for their own purposes, it may ... require the purchase of an annuity"). None of these exceptions has any pertinence in this case.

The government's second principal authority, *Nemmers v. United States, supra,* is simply inapposite. The Seventh Circuit recognized that where a lump-sum payment is awarded to a third party on the plaintiff's behalf, the court may safeguard the victim by ordering the recipient of the award to purchase an annuity. *Nemmers,* 795 F.2d at 636. That is nothing more than an example of a court's power to protect the interests of its wards. *See supra* note 16. The instant case exemplifies precisely the same point. Here, Judge Pettine (without objection from the plaintiffs) ordered the future-care damages "placed in a trust to last for the duration of Heather's life, with the articles of trust and trustees to be approved" by the district court. *Reilly I,* 665 F.Supp. at 1020.

Defendant, we believe, has placed the cart well in front of the horse. When a tortfeasor loses at trial, then—absent a statute or the parties' contrary agreement, *see supra* note 16—it must pay the judgment in one fell swoop. After the wrongdoer and its funds have been parted, the focus shifts: it cannot be doubted that the court has power (1) to ensure that the recovery benefits the victim, and (2) to exercise strict supervision over investment and use of the funds if the victim is a legal incompetent or otherwise in need of protection. But these verities in no manner support the proposition that the wrongdoer has a right to pay in installments where the plaintiffs are unwilling. Nor does the court have a right to impose a periodic payment paradigm on the parties, over protest, solely to ease the tortfeasor's burden or to suit some fancied notion of equity.

Because the FTCA represents a waiver of the government's sovereign immunity, it is to be construed conservatively. *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). We, therefore, join the Third Circuit and hold that, absent unusual circumstances not present here, *see supra* note 16, the court below was right in insisting that its award of damages be rendered in lump-sum form.[17] *Accord Frankel v. Heym,* 466 F.2d at 1228–29.

### B. *Evidentiary Value.*

▪ We need not linger long over appellant's alternative assertion. There is an argument to be made for admitting the cost of an annuity to assist the trier in calculating the present value of a future income stream, *see, e.g., Chesapeake & Ohio Ry. Co. v. Kelly,* 241 U.S. 485, 490, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916); *Montellier v. United States,* 202 F.Supp. 384, 425 (E.D.N.Y.1962), but in some other case. The government did not explicitly raise this theory below. Moreover, it failed to introduce any evidence as to the cost of such an annuity. Its expert witness did not base his present value calculations in any part upon such a cost item. Under these circumstances, we need take no view of the admissibility of such evidence in general. It suffices for today to rule that the point was not properly in issue and that the district court perforce cannot be faulted for neglecting to consider the cost of a variable annuity as bearing on the amount of damages.

## VI. THE ADMINISTRATIVE CLAIM

As we have already mentioned, *see supra* note 1, an administrative claim is a prerequisite to prosecution of an FTCA action. Notwithstanding that the case shifts from an administrative to a judicial forum once suit is started, the claim retains importance in various ways. One such way is that the amount sought can act as a ceiling on the plaintiff's eventual recovery. To be specific, the controlling statute provides that:

Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the

---

**17.** Although we bring coals to Newcastle by the observation, we are constrained to note that, in any event, the government likely waived its rights on this score by neglecting to introduce evidence of the dollar amount(s) of the periodic payments which would have been necessary ap-

propriately to compensate plaintiffs. The plaint that the district court "prevented" the introduction either of such evidence or of evidence anent the cost of a suitable annuity, *see* text *infra* Part V(B), is not supported by the record.

federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time [of] presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b).

In this instance, appellees submitted their administrative claim in the appropriate format (Form 95) in May 1985 (some 5 months after Heather's birth). They were represented by counsel at the time. They fixed the amount of the claim at $10,000,-000. This figure was never amended. When asked for the "nature and extent of injury which forms the basis of this claim," appellees inserted the following description:

Hypoxic ischemic encephalopathy resulting in seizures, blindness, profound neurological deficit; loss of consortium, emotional distress. Peter Reilly and Donna Reilly sue individually on their own behalf as well as on behalf of their minor child.

Form 95 (appended to plaintiffs' complaint).

At trial, plaintiffs sought to recover more than the upper limit of the claim. The district court honored their entreaty, setting damages in the aggregate amount of $11,037,964. The court rested disregard of the Form 95 ceiling on its finding that:

Only after May 1985 did it become medically apparent that Heather would never be able to walk or talk, and that she would be able to see only enough to distinguish light from dark.... Given the undisputed medical impossibility of knowing the extent of Heather's multiple disabilities at the time the administrative claim was filed, I find the experts' subsequent confirmation that the worst possibilities had materialized to constitute

"newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency ...," 28 U.S.C. subsection 2675(b).

*Reilly I,* 665 F.Supp. at 1011.[18] Although we start with the premise that a determination of what constitutes "newly discovered evidence not reasonably discoverable" in any particular case is the sort of fact-specific conclusion which demands a substantial degree of deference to the trial court, we believe that the determination here was plainly erroneous.

■ Because the statute itself renders the state of a claimant's knowledge (actual or constructive) at the time of presentment of the claim of decretory significance, the mechanics of a § 2675(b) inquiry must be double-barrelled: What should the party have known? When should she have known it? To be binding in this context, knowledge need not be certain. In the same vein, intelligence which serves only to bear out earlier suspicions cannot unlock the FTCA's narrow escape hatch. Diagnoses which are no more than cumulative and confirmatory of earlier diagnoses are neither "newly discovered evidence" nor "intervening facts" for the purposes of § 2675(b). *See Kielwien v. United States,* 540 F.2d 676, 680–81 (4th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976); *Powers v. United States,* 589 F.Supp. 1084, 1110 (D.Conn.1984). We agree with the Second Circuit that the statute demands a showing that "some new and previously unforeseen information came to light" between the time of filing the administrative claim and the trial on damages. *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 856 (2d Cir.1984). And, the newly-emergent datum must be material.

---

**18.** The district court made a further finding to the following effect:

[I]f physical symptomatology turns out not to be a requirement of emotional distress recovery or, alternatively, if Mr. Reilly's suicide attempt constitutes a physical symptom of emotional distress, then the attempted suicide would constitute an "intervening fact[ ], relating to the amount of the claim," further permitting recovery in excess of the administra-

tive claim's *ad damnum* under 28 U.S.C. subsection 2675(b).

*Reilly I,* 665 F.Supp. at 1012. We need not concern ourselves with where this avenue might lead, for the state supreme court has since held physical symptomatology to be a requirement of recovery for negligent infliction of emotional distress. *See Reilly III,* 547 A.2d at 896. That ends the matter for our purposes. In any event, the question is largely academic.

On this occasion, the information in question was neither sufficiently new, nor sufficiently unforeseen, nor sufficiently material. By the time the claim was filed, the Reillys were on notice of the global extent of Heather's injuries and disabilities. The evidence upon which the district court relied to lift the cap was, at bottom, nothing more than "the experts' subsequent confirmation that the worst possibilities had materialized." *Reilly I,* 665 F.Supp. at 1011. Yet these very same "worst possibilities," *i.e.,* "that Heather would never be able to walk or talk, and that she would be able to see only enough to distinguish light from dark," *id.,* were present from the start. Indeed, they were at the core of appellees' administrative claim, which alleged "seizures, blindness, profound neurological deficit" and the like as the sequelae of the harm. The mere fact that these dread consequences, feared from the beginning, had become more certain does not suffice to brand them "newly discovered."

In this regard, the instant case bears an uncanny resemblance to *Low v. United States,* 795 F.2d 466 (5th Cir.1986). In *Low,* plaintiff sought damages on her minor son's behalf for brain damage resulting from a government doctor's failure to perform a caesarean section and misuse of forceps during the ensuing vaginal delivery. *Id.* at 468. The administrative claim asked for $1,300,000 in damages, stating that the boy suffered from "cerebral palsy, seizure disorder, blindness, deafness and mental retardation." *Id.* at 471. Less than a year later, plaintiff filed suit. Ultimately, the district court, concluding that "the extent of [the boy's] condition, the prospects for any recovery, the limited extent of any prospective recovery, and [his] life expectancy" could not have been discovered originally, *id.* at 470, made an award of $3,500,000. The Fifth Circuit restricted the award to the amount of the administrative claim. *Id.* at 470–71. The court of appeals characterized the evidence cited by the district judge as pertaining merely to "the precision with which the severity of [the boy's] condition could be known." *Id.* at 471. The panel went on to note that the "basic severity" of the child's handicap was known early on, *id.;* plaintiffs were aware at the time the administrative claim was filed that "the worst-case prognosis ... was one of great severity." *Id.* Accordingly, the ceiling set by the claim's ad damnum remained in place: "if the exact nature, extent and duration of each recognized disability must be known before § 2675(b) will be given effect, that section will be rendered useless; and the government will be unable to evaluate any claim made against it without the threat that, if it does not settle, its liability may increase substantially." *Id.*

In its pertinent parameters, *Low* is on all fours with the case at bar. Here, as in *Low,* the basic severity of the child's condition was known and recited in the claim form. Dr. Vohr, an examining physician, testified without significant contradiction that, from birth, it was readily apparent that there had been "a significant insult to [Heather's] brain." J.A. 437. This conclusion was scientifically confirmed within the first two months of Heather's lifetime by electroencephalography and computerized axial tomography, and Mrs. Reilly was told that the test results were "grossly abnormal." *Id.* at 366. She was also informed from the start that Heather had suffered lack of oxygen to the brain and would require medication to control seismic seizures. Once the EEGs and CAT scans were read, as Dr. Vohr said, it was clear that "this infant [was] at serious risk for neurological sequelae." *Id.* at 438. Another physician, Dr. Shaywitz, testified that everyone "knew almost certainly by five months ... that Heather was going to have a damaged nervous system." *Id.* at 404. In February 1985, Mrs. Reilly was told by an examining physician that her daughter "would probably be blind, maybe, not totally, but would have problems." *Id.* at 381. She admitted that, when she filled out Form 95, she understood that Heather was sightless.

This, we think, was more than enough to put the parents on fair notice to guard against the worst-case scenario when preparing their claim. As in *Low,* the fact

that the degree of disability was uncertain was, in and of itself, inadequate to trigger the exception to § 2675(b). To use the district court's terminology, "[c]onfirmation that the worst possibilities had materialized," *Reilly I,* 665 F.Supp. at 1011, came no closer to constituting "newly discovered evidence" than did realization of "the worst-case prognosis." *Low,* 795 F.2d at 471. Like the *Low* court, we cannot subscribe to such a nanization of the administrative ad damnum. To so hold would be to eviscerate the statute and reduce the insertion of a monetary limit to an empty formality.

We do not categorize such a construction of the law as unduly harsh. The goal of the administrative claim requirement is to let the government know what it is likely up against: mandating that a claimant propound a definite monetary demand ensures that "[t]he government will at all relevant times be aware of its maximum possible exposure to liability and will be in a position to make intelligent settlement decisions." *Martinez v. United States,* 780 F.2d 525, 530 (5th Cir.1986); *see also* S.Rep. No. 1327, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2515, 2516 (fundamental purpose of requiring an administrative claim is "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States"). As between prospective defendant and prospective plaintiff, the latter is in by far the better position to determine the worst-case scenario or, if uncertain, to paint the picture as bleakly as reason permits and conscience allows. If a plaintiff misjudges, as to matters known or easily deducible when her claim is filed, it seems more equitable for her to bear the burden of miscalculation than to impose it on the sovereign. *Cf. Lopez v. United States,* 758 F.2d 806, 809 (1st Cir.1985) ("individuals wishing to sue the government must comply with the details of the [FTCA claim requirement]").

The cases relied upon by appellees and the district court do not necessitate a contrary result. For example, in *Joyce v. United States,* 329 F.Supp. 1242 (W.D.Pa. 1971), "[t]he initial claim was made ... within days of the injury, at a time when the full benefits of medical diagnosis were not available." *Id.* at 1247. That is markedly unlike this case, where the Reillys' administrative claim was filed five months after injury, at a point when extensive medical evaluation and testing had taken place. In *Foskey v. United States, supra,* "the many doctors who were consulted all voiced the optimistic opinion that [the injured child] would make developmental progress under proper treatment." 490 F.Supp. at 1060. That situation did not obtain here; what little optimism was extant was guarded and far from unanimous. Though not certain, Heather's lack of progress was largely anticipated, and reasonably foreseeable, when the administrative claim was filed. In *Powers v. United States, supra,* the court, in allowing the ad damnum to be amended, relied among other things on the "substantial deterioration" in plaintiff's health, and the "unanticipated" needs created thereby. 589 F.Supp. at 1110. Heather's condition, desperate from the start, did not thereafter deteriorate in any unforeseen way.

We conclude that the district court erred in allowing plaintiffs to recover damages in excess of the cap established in their administrative claim.[19]

---

**19.** Appellant's argument that the district court should be required to pare the administrative ad damnum further is made up out of whole cloth. Appellant seeks such shrinkage ostensibly to account for elements which were included in the original claim but (i) have proven to be nonrecoverable, *e.g.,* emotional distress, loss of consortium, or (ii) remain problematic, *e.g.,* deprivation of Heather's society and companionship (*see supra* note 3). The United States cites no authority which would justify trimming of that sort, or de facto proration, in the circumstances at bar. The administrative claim form did not require plaintiffs to affix a price tag to each element of the damages asserted, and plaintiffs did not do so. The government never asked for a breakdown. Accordingly, plaintiffs are entitled to receive whatever recoverable damages they can prove, up to the limit of the overall claim. In this case, the administrative ad damnum is a unitary roof which covers the entirety of the damages; there is neither reason nor

## VII. CONCLUSION

We need go no further. All of the government's earnest scrabbling avails it but slightly. By and large, the orthography of the litigation spells defeat for its cause. After defendant's alphabet of error has been recited, and its substance examined, we discern little wrong with the district judge's handling of this difficult case. Both abecedarian logic and the letter of the law dictate that appellant's assignments of error, save only one, be written off.

To recapitulate, we rule that the court below acted appropriately in the appointment and use of a technical advisor, the government having waived its right to insist on any incremental safeguards; that, although the court misperceived the interplay between R.I.Gen.Laws § 9–19–34 and the FTCA, the mistake was harmless because the United States did not prove the amount(s) of the claimed offsets; that the award of damages for Heather Reilly's lost earning potential and estimated future-care expenses was not clearly wrong; and that the lower court was under no obligation, on this record, to consider use of a structured payout or to speculate on the cost of an annuity as an aid to figuring present-value damages. We also hold, however, that the court had no sufficient basis for permitting plaintiffs to recover aggregate damages in excess of the ceiling set by their administrative claim.

*The judgment appealed from is affirmed in all respects, except that the district court, on remand, shall reduce the amount of the award in conformity with Part VI of this opinion. All parties shall bear their own costs.*

---

warrant to fragment it into a series of separate subceilings, according some artificial propor-

tionality to each and consequently, giving each limitative effect.