David R. POIRIER and
Margo C. Poirier

v.

UNITED STATES of America.

Civ. No. 88–0251–B.

United States District Court,
D. Maine.

Aug. 16, 1990.

Michael M. Dubose, Office of U.S. Atty., Bangor, Me., for U.S.

Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, Me., and Erland B. Hardy, Woodman & Edmands, Biddeford, Me., for plaintiff.

## AGREED FACTS AND FURTHER FINDINGS OF FACT AND RULINGS OF LAW BY THE COURT

LOUGHLIN, Senior District Judge.

This is an action under the Federal Tort Claims Act. David R. Poirier seeks to recover damages for personal injuries. His wife, Margo C. Poirier has brought suit for loss of consortium.

The parties through counsel have stipulated as to joint findings of fact which are incorporated by reference into this order and will be further augmented by the court's findings.

Liability was admitted by the defendant anent the abdominal surgery performed on February 24, 1986 on David Poirier. A six inch metal clamp was left in his abdomen after the operation at the Veterans Hospital in Togus, Maine.

One of the myriad issues in this case is that of causality with respect to the defendant's negligence and the subsequent surgeries David Poirier was subjected to and the health problems he has had since February 24, 1986.

Plaintiff David Poirier was born on February 24, 1949 in Biddeford, Maine and after completing two years of high school he joined the United States Marines on

February 28, 1966 and served in Vietnam beginning in May of 1967.

1. On December 12, 1967 David Poirier stepped on a land mine which exploded, and as a result, his left leg was amputated above the knee and he was fitted with a prosthesis. He also injured his back.

2. In 1969 David Poirier married his wife, Margo. They have 3 children: Kelly, age 20; Kim age 19; and Joey age 12.

3. Mr. Poirier was rated unemployable by the Veterans Administration ("VA") from May 24, 1969 until November 1, 1983. During that period of time, he was rated as 80% disabled because of the amputation, his right leg scars, and back strain secondary to the amputation. For some period of time prior to 1975, he was employed as a carpenter. For various periods from 1976 through 1983, David Poirier was employed at Maine Artificial Limb, Inc. as a prosthetic technician. In an employment statement dated April 1983, he reported that he had worked 86 months (over 7 years) for Maine Artificial Limb Co., earning an average of $10,000 a year and a maximum of $13,000 a year. Mr. Poirier lost his unemployability status in 1983, although his disability rating remained at 80%. His compensation was reduced from $1,479/mo. to $873/mo. effective November 1, 1983.

4. In that same employment statement dated April 1983, Mr. Poirier indicated that he had quit his job at Maine Artificial Limb Co. in 1982 because of back and leg pain. He applied for Social Security Disability but was turned down. After being turned down from Social Security Disability, he returned to work in August of 1982. His disability rating for lumbosacral strain was increased from 10 to 20%, but his combined rating remained at 80%.

5. In approximately 1980, David Poirier developed a bleeding ulcer.

6. On or about July of 1980, David Poirier was hospitalized complaining of intolerable epigastric pains. He was diagnosed by Dr. Owen Dow as having a bleeding peptic ulcer, although no operative intervention was taken at that time.

7. On March 23, 1984, Mr. Poirier underwent back surgery (laminectomy) for removal of a herniating disc in his spine.

8. Mr. Poirier worked from January to March 2, 1984, at Maine Artificial Limb Co. After his back surgery, he returned to work part time from July 7 through August 13, 1984, but did not return again that year. He earned gross pay of $4,495 from Maine Artificial Limb Co. in 1984, for net pay of $3,691.

9. On January 8, 1985 Mr. Poirier applied for a ratings change to increase his disability rating and to restore his unemployability status with associated benefits. He stated that because of his back injury and associated pain, and the subsequent March 1984 surgery (laminectomy), he could no longer work. His rating for back injury continued at 20%, for a total 80% disability, but he was not awarded total unemployability as he had been receiving prior to 1983.

10. Mr. Poirier appealed the January 1985 ratings decision, and on February 4, 1985, his appeal was denied.

11. On March 4, 1985, Mr. Poirier underwent a second laminectomy to correct recurrent herniated disc at the L–4/L–5 back region. The disc at L–4/L–5 and L–5, S–1 was removed with decompression of nerve roots on the right side.

12. Mr. Poirier did not work at Maine Artificial Limb Co. in 1985 until July 3, 1985, at which point he returned to work on a 2–3 day per week basis. He worked on that basis through November 14, 1985, at which point he again quit work. For the 1985 year, he earned a gross income of $4,160, or $3,640 net pay.

13. On September 17, 1985, Mr. Poirier was evaluated by Dr. Ross Davis, the physician who had performed the two laminectomies in 1984 and 1985. Mr. Poirier indicated to Dr. Davis that he could not go on working for Maine Artificial Limb because of the standing that it required. Dr. Davis agreed that he could not continue on with that line of work, and agreed with a proposal to be retrained as a computer technician. Beginning in January, 1986, although Mr. Poirier's disability rating re-

mained at 80%, he was again awarded total unemployability benefits because of the combined effects of his various disabilities, including leg amputation and degenerative disc disease.

14. Sometime prior to 1986, David Poirier developed an esophageal hiatal hernia problem, as a result of which he was unable to properly digest food, suffered from insomnia, and an excessive buildup of gas in his stomach and severe cramps. He was initially treated conservatively without success and was ultimately recommended to have a Nissen fundoplication operation. A Nissen fundoplication is a procedure whereby the body of the stomach is wrapped around the esophagus to create a 360 degree wrap and prevent fluid from going back up the esophagus.

15. On February 23, 1986, Mr. Poirier was admitted to the Veterans Administration Medical Center at Togus, Maine, with esophageal reflux and severe esophagitis for repair of a hiatal hernia. Mr. Poirier had been under the care of a local physician, Dr. James Georgitis, for several months preceding his admission to the Togus VA. A conservative medical regimen had not proved successful in controlling his reflux symptoms, and therefore Dr. Georgitis had referred him to the Togus VA for surgical treatment directed at repair of his hiatus hernia and a Nissen fundoplication to re-establish competence of his lower esophageal sphincter.

16. On February 24, 1986, a Nissen fundoplication was performed at the Veterans Administration Medical Center at Togus, Maine (VAMC Togus) by Dr. John Dinan using a # 48 esophageal bougie. He was assisted in the operation by Dr. Peter Areson, a fourth-year resident in surgery. Dr. Dinan was an employee of the VAMC Togus. At the conclusion of the surgery, a metal clamp was inadvertently left in David Poirier's abdomen.

17. From February 24, 1986 through March 2, 1986, David Poirier remained at Togus recuperating from his surgery. His post-operative course proceeded for 6 days until March 3, 1986 when at around midnight, he developed severe abdominal pain and diaphoreses. A KUB (x-ray) revealed that a metal clamp had been left in the surgical sight after the February 24 surgery, its location in the right mid-to-upper quadrant of the abdomen.

18. On March 3, 1986, in the early morning hours, the clamp in David Poirier's abdomen was discovered and removed in an emergency procedure performed by Dr. Britton, since deceased. The clamp was found to have knotted in David Poirier's small intestine and a portion of necrotic ileum which had herniated through the ring handle of the clamp was removed in the procedure by Dr. Britton. The small intestine was then reattached.

19. The act or failure to act which resulted in the clamp being left in the operative site constituted malpractice or negligence as those terms are used in 38 U.S.C. § 4116(a).

20. A small bowel resection was carried out by Dr. Britton, the retained clamp was removed and the abdomen was then closed. On March 9, 1986, David Poirier was discharged home.

21. On April 14, 1986, Dr. Dinan ordered that an upper GI (gastrointestinal) series be done through Dr. Georgitis, Mr. Poirier's local physician. That GI series showed no abnormality of the esophagus, stomach or small bowel.

22. On May 1, 1986 Mr. Poirier was seen by Dr. Georgitis to go over the results of the GI series.

23. Sometime between March and September, 1986, David Poirier experienced a recurrence of some of his previous symptoms associated with his esophageal reflux condition.

24. On September 18, 1986, Mr. Poirier underwent a second Nissen fundoplication procedure. This one was performed by Dr. Georgitis. Dr. Georgitis found problems with the original Nissen fundoplication. He performed a Nissen re-do over a # 32 bougie. David Poirier was discharged on September 25, 1986, with a discharge diagnosis of recurrent reflux esophagitis and failure of a previous Nissen fundoplication.

25. On January 10, 1987, Mr. Poirier was admitted to Southern Maine Medical Center (SMMC) complaining of abdominal discomfort, believed to be an incomplete bowel obstruction by Dr. Georgitis that resolved spontaneously. An upper GI series showed an intact hiatal hernia repair without small bowel abnormality, but showing a small duodenal ulcer as being present.

26. On March 29, 1987, David Poirier was admitted to SMMC believed to be suffering from incomplete small bowel obstruction. He was discharged on March 30, 1987.

27. On April 15, 1987, Mr. Poirier was readmitted to SMMC complaining of abdominal pain and cramps, without nausea or vomiting. Dr. Georgitis performed a laparotomy and lysis of adhesions, and inserted a Joel Baker tube to help alleviate small bowel obstruction problems.

28. On May 1, 1987, Mr. Poirier was readmitted to SMMC for operative removal of the Joel Baker tube, which had knotted, complicated by a wound infection. The tube was removed and Mr. Poirier was discharged on May 11, 1987.

29. On August 9, 1987, Mr. Poirier was readmitted to SMMC with acute cholecystitis. A cholecystectomy for removal of gall stones was performed on August 10, 1987, and Mr. Poirier was discharged on August 13, 1987.

30. On August 20, 1987, Dr. Georgitis noted in an office visit that Mr. Poirier had a ureteral calculus seen on IVP on August 19, 1987.

31. On September 9, 1987, Dr. Georgitis prescribed valium (5 mg.) to Mr. Poirier after he had called "quite upset over the abrupt leaving of his 17–year old daughter from home." Dr. Georgitis recommended that he consider psychiatric intervention and get back in touch with him in seven days with respect to the effectiveness of therapy.

32. On September 21, 1987, Mr. Poirier was readmitted to SMMC with a 5 × 3 cm. right ureteral stone, which was removed via open ureterolithotomy. He was discharged on September 27, 1987.

33. On February 16, 1988, David Poirier underwent an endoscopy and dilation procedure.

34. On April 26, 1988, Mr. Poirier was referred to a Dr. Paul Meadows by Dr. Georgitis for complaints of severe chest discomfort. Dr. Meadows ruled out mitrovalve prolapse, but noted Mr. Poirier's family history for premature disease of the coronary arteries, as well as the fact that he was a 1½ to 2 pack a day smoker. He recommended that Mr. Poirier begin work on a treadmill in order to obtain stress test results.

35. On May 18, 1988 Mr. Poirier again underwent an endoscopy by Dr. Georgitis at SMMC, with a pre-operative diagnosis of peptic ulcer disease, and a post-operative diagnosis of gastric atony.

36. On July 14, 1988, Mr. Poirier again underwent an endoscopy by Dr. Georgitis which exploration found normal post-operative changes to the stomach for a post-Nissen fundoplication.

37. On July 29, 1988, Mr. Poirier underwent an exploratory laparotomy and lysis of adhesions.

38. In November of 1988, Mr. Poirier was referred to Dr. William H. Van Deinse by Dr. Georgitis for evaluation of lower gastrointestinal symptoms. Dr. Van Deinse continued to see Mr. Poirier through January, 1989, ruling out dumping syndrome, and instead diagnosing a variation of Irritable Bowel Syndrome.

39. On September 21, 1989, Dr. Georgitis again performed an endoscopy of Mr. Poirier for questionable gastric outlet obstruction and esophageal inflammation. The results were essentially normal except for a limited area of esophagitis. The last office visit with Dr. Georgitis was on September 28, 1989, with arrangements made for follow-up on an as-needed basis.

40. David Poirier returned to work at Maine Artificial Limb from November through July 1987 [sic].

41. In the fall of 1988, David Poirier enrolled in a retraining program at Southern Maine Vocational Technical Institute. He enrolled in a drafting program at S.M.V.T.I. in the fall of 1989, but dropped out.

42. That negligence directly resulted in the March 3 surgery to remove the clamp, as well as the small bowel resection that was necessitated due to a portion of the ileum having become incarcerated through a clamp handle.

43. Post-operative adhesions may result from any intra-abdominal procedure.

44. Mr. Poirier's gross wages from Maine Artificial Limb Co. for the years 1982 through 1987, according to his U.S. Individual Income Tax Returns, were as follows:

| 1982 | $13,470. |
| 1983 | $17,080. |
| 1984 | $ 4,495. |
| 1985 | $ 4,160. |
| 1986 | $ 2,660. |
| 1987 | $ 5,950. |

45. The February 24 and March 3, 1986 surgeries at the VA Medical Center in Togus, Maine, and the hospital stay from February 24–March 9, were medical services provided to Mr. Poirier, a veteran, free of charge.

46. Since his discharge from the VA on March 9, 1986, Mr. Poirier has submitted bills from other non-VA medical facilities and physicians for payment through the VA Fee Services Section. In total, $5,373.57 of those bills were paid by the VA.

47. From February 24, 1986, through June 30, 1990, David Poirier received the following benefit amounts based on his disability rating and unemployability status:

Veteran, wife, and 3 children

| 2/24 | thru 11/30/86 | $ | $1,619/mo. | = | $14,948.76 |
| 12/1/86 | thru 11/30/87 | $ | 1,644/mo. | = | 19,728.00 |
| 12/1 | thru 12/31/87 | $ | 1,707/mo. | = | 1,707.00 |
| 11/1 | thru 6/30/88 | $ | 1,793/mo. | = | 10,758.00 |

Veteran, wife, and 2 children

| 7/1 | thru 11/30/88 | $ | 1,662/mo. | = | 8,310.00 |
| 12/1/88 | thru 6/30/89 | $ | 1,725/mo. | = | 12,075.00 |
| 7/1/89 | thru 8/27/89 | $ | 1,815/mo. | = | 3,448.50 |

Veteran, wife, and 1 child

| 8/28 | thru 11/30/89 | $ | 1,679/mo. | = | 5,204.90 |
| 12/1/89 | thru 6/30/90 | $ | 1,758/mo. | = | 12,306.00 |

TOTAL COMPENSATION = $88,486.16
(Feb. 24, 1986 thru June, 1990)

---

The following are the Findings of Fact and Rulings of Law by the Court.

Life has not been kind to David. He suffered severe and debilitating injuries in the Vietnam war. He lost his left leg and has service connected lower back injuries. Since Vietnam David has had problems with esophageal reflux and severe esophagitis for repair of a hiatal hernia.

After the operation of February 24, 1986 and Dr. Britton's corrective surgery of March 3, 1986 David had a variable nightmare of maladies. He came once again under the medical supervision of Dr. Georgitis. It is the finding of the court that David had recurring symptoms within six months of the removal of the clamp. This necessitated the second Nissen fundoplication operation by Dr. Georgitis. Dr. Georgitis spent one and three quarters hours removing adhesions and noted that before he performed remedial surgery the original wrap was only 180 degrees in circumference.

During 1987 David was hospitalized on January 10, March 29, April 15, and May 1.

Generally the ailments pertained to bowel obstruction or discomfort and a small duodenal ulcer was also perceived. The court finds these ailments were causally related to the surgery of February 24, 1986 and were exacerbated by the trauma of necessary subsequent surgical procedures. The court finds that there is evidence that possibly the cholecystectomy or removal of the gall bladder on August 10, 1987 and the open ureterolithotomy or removal of a kidney stone on September 21, 1987 were causally related to the untoward incident of February 24, 1986, but not by a preponderance of the evidence.

■ The court finds that the endoscopy and dilation procedure of February 16, 1988 were causally related as were the procedures of May 18, July 14, and July 29, 1988 and the treatment by Dr. William H. Van Deinse in November 1988 and through January, 1989. The treatments by Dr. Georgitis in September, 1989 were all causally related. The plaintiff has shown by preponderance of the evidence that the defendant's departure from a recognized standard of care was the proximate cause of the injury and resulting exacerbation in this medical malpractice case. *Cox v. Dela Cruz*, 406 A.2d 620 (Me.1979). It is also more probable than otherwise that David will continue to suffer discomfort in the future as a consequence of the operative procedures that he has had to endure.

During the period heretofore alluded to David suffered pain, he was gagging, and experienced dry heaves. The Nissen fundoplication operation has been pristinely described by Dr. Emerson H. Drake in his deposition at page 8 as follows. "It consists of wrapping the upper portion of the stomach around the lower esophagus, sutured in place usually with a dilator in place in the esophagus. To prevent it from being too tight, usually the dilator is a size 50 to 60 French dilator."

According to Maine law negligence alone is not enough to impose liability. Negligence is actionable only if it proximately causes an injury to another—that is, if it "is a substantial factor in bringing about the harm." *Wing v. Morse*, 300 A.2d 491, 495–96 (Me.1973).

To summarize. The VA's negligent conduct was a substantial factor in bringing about the suture failure which led to Dr. Georgitis re-doing the Nissen fundoplication operation on September 18, 1986. This also led to the additional surgical and medical interventions which were necessitated by the subsequent small bowel obstructions, which in all probability David will suffer in the future. David has not sustained by a preponderance of the evidence that the gall stone and kidney stone operations were proximately caused by the untoward incident of February 24, 1986.

### DAMAGES

In addition to David proving causation the onus or burden is also on him to prove his damages or pecuniary loss. *Casco Bank & Trust Company v. The Bank Of New York*, 584 F.Supp. 763 (D.Me.1984).

Damages must not rest wholly on surmise and conjecture. *Michaud v. Steckino*, 390 A.2d 524, 530 (Me.1978).

The evidence in this case is quite conclusive that David suffered severe and agonizing pain both physical and mental which was caused by the removal of the retained clamp. After the March 3, 1986 surgery for the removal of the clamp and the small bowel resection, his pain continued. David continues to this date, and in all probability in the future will continue, to have further small bowel difficulties exacerbated by problems concomitant with the adhesive process in his abdomen. Added to this is the emotional pain and uncertainty as to his future prognosis for a standard of life which has been minimized already by his serious war injuries. Understandably he has been depressed and has sought the services and advice of Dr. Daly, a psychiatrist. Dr. Daly gave David a minor tranquilizer Ativan. This was used to deal with David's anxiety and tension and to eschew David's angry moods. David was frustrated with family problems and his future in particular with his upcoming lawsuit.

Dr. Daly stated that David has had a lot of different stresses in his life, the loss of

his leg, family problems and this was all compounded by the surgery at the VA which did not go well, which subsequently caused him a conglomeration of other medical problems which made it difficult for him to function normally. He feels overwhelmed at times.

It is Dr. Daly's opinion that many of David's current psychological problems which include sadness, anxiety and discouragement are directly related to the failed surgery at the VA.

Dr. Daly opined that the failed surgery has been very much a turning point in his life. It has turned him from somebody who had been working productively for a living to somebody who has been spending a great deal of time in lawyers' offices and doctors' offices and until recently really not doing a whole lot in his life. David's need for psychiatric treatment is causally related.

One of the most difficult tasks that a fact finder has to deal with is ascertaining a fair and equitable sum of money to be paid to the victim of a tort-feasor. One has to be fair to the injured party and not be overgenerous on one hand and parsimonious on the other hand. The award for pain and suffering should not be punitive against the person or agency inflicting the injury. There are exceptions of course where punitive damages may be awarded, but this case is not one of them as it was purely accidental. David has a life expectancy of thirty-three years. His suffering physically, mentally and emotionally will continue, abated to some degree, for the rest of his natural life. The court awards him the sum of $650,000.00 for conscious pain and suffering, past, present and future, loss of enjoyment of life and permanent disability. In arriving at this sum of money the court has considered the following: His probable length of life, the pain and uncertainty surrounding the remedial surgery performed on him on March 3, 1986, the despair and lack of confidence in the VA later evidenced by using civilian hospitals at his expense, the recurring reflux problem with its attendant pain, depression, the natural concomitant of the maladies which left him in an acclumsid frame of mind, worry and concern about his work capabilities in the future together with his concern for his and his family's financial well being, the innumerable operations and procedures and doctor visits, seeing various specialists, the continuing pain both physical and mental and the gnawing uncertainty of what will befall him in the future are some of the factors in the award.

Another element of damages is lost wages and loss of earning capacity.

David had a limited education, because it was interrupted by his patriotic gesture in joining the United States Marines in the Vietnam War. He attempted to improve his educational skills by attending computer school prior to the first Nissen procedure at Togus, Maine. David's employment record was spotty not due to lack of initiative, but due to his physical debility. In 1983 he earned his highest salary of $17,080.00. From 1969 through 1983 he had received full 100% disability benefits from the VA due to unemployability due to his back condition.

Paragraphs 3 through 13 in the stipulated facts succinctly set forth David's work history as it is germane to this case, together with apposite contemporaneous medical background. To recapitulate for a period of 86 months in an employment statement dated April, 1983 he earned an average of $10,000 a year. His gross pay for 1984 was $4,495.00, for 1985 his gross pay was $4,160.00. 1986 was a year of sporadic employment for David due to his medical problems. He earned $3,273.81. In 1987 he earned $5,950.00. In 1988 he earned $510.00.

There has been a steady decline in David's gross income as evidenced by his 1986, 1987 and 1988 income tax returns. Due to his preexistent physical condition David has problems with a full work load, but there is little doubt that the untoward event of February 24, 1986 exacerbated his condition to such an extent that his earning capacity was and continues to be impaired. The court does not agree with the government's contention that his earning capacity

is non-extant, although it has been substantially impaired. Evidence of past earnings is, of course, relevant to the issue of damages from impairment of future earning capacity and such evidence need not be mathematically precise. *Michaud v. Steckino*, 390 A.2d 524 (Me.1978).

The assessment of damages for impairment of earning capacity rests largely upon the common knowledge of the jury or other fact finder, sometimes with little aid from evidence; helpful evidence is admissible, although it does not furnish any mathematical valuation of the impairment. *Goldstein v. Sklar*, 216 A.2d 298, 309 (Me.1966).

David is entitled to an award by the fact finder that would fairly, reasonably and adequately compensate him for his pain and suffering, past and future, mental and physical, as well as for his loss of health and loss due to diminished earning capacity, past and future, proximately ascribable to his injury. *Goldstein* at 308.

■ Loss of earning capacity has been computed at $113,050.00 based on a remaining work expectancy of 19 years (to age 60) and using $5,950.00 as the basis to compute David's annual earning capacity. The court did not apply either discount or inflation factors.

The court arrives at a figure of $13,027.50 for lost wages by using David's income earned in 1987 and matching it with income earned in 1986, $510.00 in 1988 and presumably none in 1990 through August first. The total for loss of earning capacity and lost wages is $126,077.50.

■ David's medical bills total $47,701.53, less $5,373.57 that the VA has paid or due David is the sum of of $42,327.96.

The court renders a judgment for the plaintiff, David Poirier, in the sum of $818,405.46.

Margo Poirier has a loss of consortium action. She and David were married in February, 1969 and they have three children. Since her marriage Margo has worked at various jobs. Under Maine law Margo is entitled to recover damages for physical and emotional injuries. Maine has recognized that a person's well-being is as much entitled to legal protection as is his physical well being. We recognize as much and provide compensation when the emotional distress is intentionally or recklessly inflicted, when the emotional distress results from physical injury negligently inflicted, or when negligently inflicted emotional distress results in physical injury. *Gammon v. Osteopathic Hospital Of Maine, Inc.*, 534 A.2d 1282 (Me.1987).

Loss of consortium has been aptly described in *LaBonte v. National Gypsum*, 110 N.H. 314, 269 A.2d 634 (1970). " 'Consortium,' as a general description, represents reciprocal rights inherent in the marital relationship of husband and wife, including such undefined elements as comfort, companionship, and commitment to the needs of each other." *LaBonte*, 110 N.H. at 318, 269 A.2d at 637 (citing *Thill v. Modern Erecting Co.*, 284 Minn. 508, 170 N.W.2d 865, 867–68 (1969)). "It 'embraces love, companionship, affection, society, sexual relations, services solace.' " *LaBonte*, 110 N.H. at 318, 269 A.2d 637 (quoting *Moran v. Quality Aluminum Casting Co.*, 34 Wis.2d 542, 150 N.W.2d 137 (1967)). *See also* 19 M.R.S.A. § 167–A (1967). *Britton v. Dube*, 147 A.2d 452, 154 Me. 319 (1958).

Since her marriage she has worked at various jobs to make ends meet. She worked at a local ice arena at a snack bar, for the Town of Biddeford as a parking control officer and part-time as a school bus driver. Margo quit her school bus driving job in 1986 in order to aid David after his surgeries at the VA hospital. She is a certified nurse assistant and she provided private nursing care to her husband. These included bathing him, succor in moving about as he was at bed rest for a substantial period of time, preparing meals, cleaning the surgical area, giving him medication and performing other routine but necessary nursing duties.

Margo herself suffered greatly both physically and emotionally from the problems which her husband had to endure. She suffered the trauma of being advised in the early hours of the morning that her husband was undergoing immediate emer-

gency surgery, a fear-filled ride to Togus and the added shock of not seeing him in his bed with the immediate thought that David had expired. She has observed his inability to do things he used to do such as a proclivity to do handy work around the home. David's depression and mood changes have affected her requiring her to seek medical treatment for herself. The conjugal relationship between them for a period of time came to a standstill.

Margo was out of work for a period of time. Her services conservatively had a value of $6.00 an hour and Margo averaged approximately four to six weeks caring for her husband on a full time basis after each of his hospitalizations.

■ The evidence is that the close relationship that was once extant between them has been impaired to a great degree. Margo was treated by Dr. Merrill R. Farrand, Jr. for stress related symptoms. Dr. Farrand is a family practitioner in Kennebunk, Maine and his deposition was taken on November 27, 1989. Margo in addition to stress related to David was also experiencing difficulty with her daughter. Dr. Farrand candidly stated that a more accurate way of reflecting whether Margo's stress-related symptoms were directly related to her husband's health would be to state the following. "David's health stressors to Margo may be all or partially responsible for stress complaints or anxiety complaints." Dr. Farrand's Deposition at 34. Margo's bill for treatment amounted to $830.98. Some of it no doubt may be related to problems with Margo's daughter, but to try to differentiate would be picayune. The court awards a judgment to Margo Poirier in her loss of consortium action in the sum of $100,000.00.

## Ad Damnum

The plaintiffs filed their original notice of claim on February 12, 1988. The demand was for the sum of $800,000.00. This also included the loss of consortium claim of Margo Poirier. On October 27, 1988 the plaintiffs filed this action.

28 U.S.C. § 2675(b) provides:

Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts relating to the amount of the claim.

An administrative claim is a prerequisite to prosecution of an FTCA action. *Reilly v. United States*, 863 F.2d 149, 170 (1st Cir. 1988).

The First Circuit agrees with the Second Circuit that the statute demands a showing that "some new and previously unforeseen information came to light" between the time of filing the administrative claim and the trial on damages. *Reilly*, 863 F.2d at 171.

■ The motion to strike the increase in the ad damnum from $800,000.00 to $1,500,000.00 becomes a closer call in view of this court's findings that the kidney stone and gall stone operations while possibly causally related to the incident of February 26, 1986 were not proved to a reasonable degree of medical certainty or by a preponderance of the evidence. Albeit, the plaintiffs would have been hard pressed unless they were clairvoyant to foresee the resulting mental anguish, economic loss, and the reasonable probability of future surgical procedures resulting from the foibles of the defendant.

The court is satisfied that new material evidence was not reasonably discoverable when the claim was presented to the Togus VA. However, should the First Circuit disagree with this court's finding, judgment should be entered for the plaintiffs in the sum of $800,000. The sums can thus be proportionately allocated between the plaintiffs.

## Government Set Off

■ The Government claims that plaintiffs' amount of damages should be reduced by the amount of unemployability benefits David Poirier received from the VA since February 24, 1986. As far as any set-off is concerned, both parties agree that

any compensatory damage award given plaintiffs be set-off by $5,373.57, the amount representing David Poirier's private medical bills already paid by the Veterans Administration. Finding No. 46. The dispute arises in any further set-off for disability benefits paid and to be paid to David Poirier in the future.

As stated earlier, under the Federal Tort Claims Act the court is obliged to apply Maine law to issues arising in the case at hand. The law of Maine recognizes the collateral source rule. *Werner v. Lane*, 393 A.2d 1329 (Me.1978). According to the collateral source rule, "if a plaintiff is compensated in whole or in part for his damages by some source independent of the tortfeasor, he is still permitted to have full recovery against the [tortfeasor]." *Werner* at 1335. The problem here, as was similarly a problem in *Mooney v. United States*, 619 F.Supp. 1525 (D.N.H.1985), is that the tortfeasor is the one making payments to the plaintiff, i.e. the United States Government. The court finds that plaintiffs' recovery under the Federal Tort Claims Act should *not* be reduced by any amount awarded plaintiffs other than the $5,373.57 already agreed upon by the parties.

In *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), the Supreme Court held that "the receipt of disability payments under the Veterans Act was not an election of remedies and did not preclude recovery under the Tort Claims Act but only reduced the amount of any judgment under the [Tort Claims] Act." *United States v. Brown*, 348 U.S. at 113, 75 S.Ct. at 144. However, the facts in the *Brown* case are distinguishable from the facts in the Poirier case. Mr. Brown, a veteran, injured his knee while on active duty in the Armed Services. A few years after being discharged, Mr. Brown underwent two knee operations at a VA hospital to correct the problems with his knee. During the second operation, an allegedly defective tourniquet was used, resulting in serious and permanent injury to the nerves in Mr. Brown's leg. Mr. Brown received a compensation award for his knee injury when he was honorably discharged from the service and the award was increased after the second operation. The Court allowed Mr. Brown to sue under the Federal Tort Claims Act because his injury resulted from a defective tourniquet used in a VA hospital for an injury he already was receiving benefits for. However in this case, David Poirier was receiving VA benefits for injuries sustained from his active duty in Vietnam. The claim he currently brings under the Federal Tort Claims Act is entirely independent from those injuries for which he already was receiving benefits for, i.e. amputation of his leg and back problems, whereas the suit he now has filed results from the negligent performance of the Nissen operation on his abdomen at the Togus VA Hospital.

To apply the rationale that the VA should have a setoff could have a ludicrous result as the following examples would show. If David was a non-disabled veteran, but entitled to veterans benefits there would of course be no issue pertaining to the collateral source rule and he would recover in full. To penalize David because of his serious war injuries and indirectly to imply that negligence will partially excuse a tort-feasor if it is paying a benefit does not make sense.

Also the court is hesitant to reduce plaintiffs' award in this case by any future benefits from the VA in light of the uncertainty of those benefits. It is well known that Congress has the authority to change the level of VA benefits at anytime it may dictate, and the Veterans Administration has the right to adjust its determinations as to the percentage of benefits David Poirier is entitled to, again, at anytime based upon employability standards that Mr. Munro himself testified were difficult to articulate with any specificity. Additionally, the Government failed to call an expert economist in this case.

■ "Except to the extent it has waived its immunity, the Government is immune from claims for attorney's fees." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983) (citing *Alyeska Pipeline Co. v. Wilderness*

**34**

*Society,* 421 U.S. 240, 267–268, & n. 42, 95 S.Ct. 1612, 1626–1627, & n. 42, 44 L.Ed.2d 141 (1975)). The Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) waives the Federal Government's immunity in certain circumstances and will not provide attorney's fees in suits "sounding in tort". Therefore plaintiffs are not entitled to recovery of attorney's fees in this case.

Under the Federal Tort Claims Act, the United States is "not liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. Therefore interest will accrue on the judgment awarded by this court commencing the date of this opinion.